UNITED STATES of America, Plaintiff-Appellant,

v.

Gary MERRITT and Cori Desroches, Defendants-Appellees.

UNITED STATES of America, Plaintiff-Appellee,

v.

Charles McGILL, John Hartsel, Patrick Murray a/k/a James Murphey, and Arthur Desroches, Defendants-Appellants.

Nos. 82–3689, 82–3736.

United States Court of Appeals, Fifth Circuit.

June 29, 1984.

Rehearings Denied in No. 82–3736 Aug. 30, 1984.

---

Robert Glass, New Orleans, La., Joel Hirschhorn, Harry M. Solomon, Miami, Fla., for Charles McGill.

Louis Vernell, North Miami Beach, Fla., for John Hartsel and James Murphy.

Robert N. Habans, Jr., New Orleans, La., for Arthur DesRoches.

Robert Steven Lemoine, New Orleans, La., for Cori DesRoches.

Louis Vernell, North Miami Beach, Fla., James G. Roth, Miami Beach, Fla., for Gary Merritt.

John Volz, U.S. Atty., Howat A. Peters, Jr., Harry W. McSherry, Asst. U.S. Attys., New Orleans, La., for the U.S.

Before TATE, JOLLY, and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Charles McGill, John Hartsel, Patrick Murray a/k/a James Murphey, and Arthur DesRoches appeal their convictions on drug trafficking charges.[1] The United States

---

1. All defendants were convicted of two substan- tive counts: possession with intent to distribute

appeals the judgments of acquittal granted by the district court to Cori DesRoches and Gary Merritt following a jury verdict of guilty as charged on all counts. The government's appeal was argued separately; however, the appeals are consolidated for the purposes of this opinion. We affirm the convictions of Charles McGill, John Hartsel, Patrick Murray, and Arthur DesRoches as well as the judgments of acquittal granted Cori DesRoches and Gary Merritt.

## I.

On November 2, 1981, United States Customs officials advised Louisiana State Police officers that they had received an unverified tip that an attempt would be made to import a large volume of marijuana into eastern Louisiana. After receiving this information, state police began a systematic surveillance of suspected marijuana smugglers and sites believed to be used to unload and store marijuana. They also checked motel parking lots in the Slidell, Louisiana area for vehicles and vessels that might be used in a smuggling operation. On the morning of November 3, 1981, investigators discovered a Jeep pick-up truck and a Robalo speed boat from Florida parked at the Ramada Inn in Slidell. Further investigation revealed that the truck and boat belonged to Richard Merrill, a suspected smuggler who was a guest at the motel. Officers placed the truck and boat under surveillance. Later that afternoon Charles McGill pulled the boat to a launch at Fort Pike where he met Merrill. Merrill and McGill took circuitous routes to reach their Fort Pike destination, in fact they drove past the boat launch several times. They launched their speed boat just before dark and waited for darkness to fall before leaving the dock. Under cover of darkness and without showing any running lights, Merrill and McGill were observed navigating the Robalo into the Rigolets, a pass which connects Lake Ponchartrain and

Lake Borgne. Lake Borgne opens into the Mississippi Sound which is part of the Gulf of Mexico. Police lost sight of the boat and its occupants after it left the dock. At approximately 11:30 p.m. the officers requested that the St. Tammany Parish Sheriff's patrol boat enter Lake Ponchartrain and look for the Robalo. At approximately 11:35 p.m., however, the Robalo returned to the Fort Pike launch.

As McGill and Merrill were loading the Robalo on their trailer, agents at Fort Pike overheard McGill or Merrill state: "Don't know why they're so mad, we did the best we could with what we had," which officers interpreted as evidence that the Robalo had met with another vessel. Merrill and McGill were followed back to the Ramada Inn in Slidell where officers maintained a surveillance. The sheriff's patrol boat was ordered to look for a larger "mother" vessel on Lake Ponchartrain.

At approximately 11:40 p.m. the patrol boat spotted the M/V FORTY, a 55-foot wooden hull vessel with the configuration of a vessel used to transport work crews in the offshore oilfield. The officers pulled alongside the vessel, instructed the vessel to stop, and asked the crew to identify themselves and state their business. Captain Arthur DesRoches advised officers that he and his crew, Gary Merritt and Cori DesRoches, were from Miami, Florida and the men were diving for treasure off the coast of Mandeville, Louisiana. The officers did not believe this unusual reason for being in the area, they also noted that the vessel reeked of pine oil—a substance often used by smugglers to hide the odor of marijuana. After obtaining this information, officers asked the M/V FORTY to follow them to Geohegan's Marina, located on the Rigolets across from Fort Pike.

After the M/V FORTY arrived at Geohegan's Marina, a United States Customs official boarded the vessel and entered the hold to compare the main beam number

marijuana, 21 U.S.C. § 841(a)(1) (Supp. VIII 1982), 18 U.S.C. § 2 (1976) (aiding and abetting) and importation of marijuana, 21 U.S.C. § 952 (1976), 18 U.S.C. § 2 (1976) (aiding and abet-

ting); and two conspiracy counts: conspiracy to possess with intent to distribute marijuana, 21 U.S.C. § 846 (1976) and conspiracy to import marijuana, 21 U.S.C. § 963 (1976).

with the vessel's documentation papers. Customs officers noticed that the vessel was wet with pine oil, and contained food products from Colombia and Venezuela. They also found marijuana gleanings in the hold. After obtaining this evidence, all three men were arrested. As Arthur Des-Roches produced identification he dropped several pieces of paper including the business card of Charles McGill into the water.

The prosecution established that the M/V FORTY passed under the Southern Railway bridge on November 3, 1981, at approximately 6:20 p.m., westbound into Lake Ponchartrain. The railway bridge is west of the Fort Pike boat launch so a vessel entering Lake Ponchartrain from the Gulf of Mexico would first pass the boat launch at Fort Pike (on the Rigolets which connects Lakes Ponchartrain and Borgne) and then go under the railway bridge into Lake Ponchartrain. A vessel resembling the Robalo passed the bridge westbound at 7:23 p.m. The FORTY came through the bridge eastbound out of Lake Ponchartrain at 11:24 p.m. and the vessel resembling the Robalo was behind the FORTY and cleared the bridge at 11:25 p.m. Only ten other vessels passed under the bridge between 6:20 and 11:25 p.m.

State police officers continued to maintain a surveillance over suspects Merrill and McGill at the Ramada Inn in Slidell, Louisiana. Between 12:30 p.m. and 2:00 a.m. the officers observed movement and visiting between the rooms of Merrill, McGill, and another guest—Vernon Holt. At approximately 9:00 a.m. the next day, November 4, the three men left the Ramada Inn in separate vehicles. Merrill and McGill drove east on Interstate 10 while Holt went west. All three individuals were stopped and arrested by Louisiana State Police officers.

An investigation of records of telephone calls at the Ramada Inn revealed that a call had been placed from Vernon Holt's room to occupants of a residence at 129 Roan Lane in Lacombe, Louisiana, a community approximately twelve miles from Slidell. The residence was already under surveil-lance for suspected narcotics activity and Patrick Murray a/k/a James Murphey and John Hartsel were observed on the premises at approximately 9:00 a.m. on November 4. State police arrested Murray as he left the residence. Officers then approached Hartsel in the front yard of the residence; as he attempted to enter the house he was asked to stop and give his name. As Hartsel identified himself, agents noticed marijuana gleanings on the ground and Hartsel was arrested and informed him of his rights. Hartsel was asked if marijuana was being concealed on the premises and he responded: "I didn't put it there." The premises were then secured while authorities obtained a search warrant. When the residence was searched approximately 1,500 pounds of marijuana were found.

A government expert was able to place the M/V FORTY at the Roan Lane address because several of the tires used as bumpers on the stern of the vessel left distinctive impressions on the dock. This and other circumstantial evidence supported the prosecution's theory that the Robalo led the M/V FORTY from Lake Ponchartrain through the connecting bayous and canals to the Roan Lane residence where the FORTY discharged a large quantity of marijuana.

Each defendant challenges the district court's denial of his motion to suppress evidence seized at the time of arrest. These challenges turn on the propriety of each arrest and seizure of evidence pursuant to that arrest. Defendants Charles McGill, Arthur DesRoches, Patrick Murray, and John Hartsel also disagree with the trial court's determination that the evidence supports the guilty verdict rendered against them. The government challenges the trial court's conclusion that the evidence was insufficient to support the guilty verdicts rendered against Cori DesRoches and Gary Merritt. Our review of the rulings on the suppression motions requires an examination of the record to determine police knowledge of inculpating facts at the time of each arrest. A broader review of the record is required to determine whether

the evidence supports the verdict as to each defendant. We are mindful of the guiding principles. There must be substantial evidence and if more than one reasonable construction of the evidence is possible, we must take the view most favorable to the government. See *United States v. Freeman*, 660 F.2d 1030, 1034 (5th Cir.1981), *cert. denied*, 459 U.S. 823, 103 S.Ct. 54, 74 L.Ed.2d 59 (1982). We now turn to the challenge of each appellant.

## II.

### A. CHARLES McGILL

In support of his argument that his motion to suppress was improperly denied, McGill contends that the district court's findings of fact are clearly erroneous and that the district judge should not have relied on evidence introduced at trial to support the court's pretrial denial of the motion to suppress. The court's findings are not clearly erroneous and evidence adduced at the suppression hearing supports the court's determination that McGill's arrest was legal.

■ At the time McGill was stopped on Interstate 10, the officers had knowledge of enough facts to establish probable cause for arrest. "Probable cause exists where 'the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959). When McGill was stopped the officers knew: (1) the customs tip, (2) McGill was associating with Merrill, a suspected narcotics smuggler, (3) McGill had taken a circuitous route from the Ramada Inn to Fort Pike, (4) the Robalo had been on Lake Ponchartrain at night without lights in close proximity to the FORTY, (5) the remarks of Merrill or McGill at the Fort Pike landing indicated a rendezvous with another vessel had occurred, (6) marijuana gleanings had been discovered aboard the M/V FORTY. In light of these facts, the district court was not clearly erroneous in denying McGill's motion to suppress.

■ Even if the arrest was illegal, McGill voluntarily signed a form consenting to the search. Evidence obtained from an informed and voluntary consent to search is admissible despite an illegal arrest. *See, e.g., United States v. Troutman*, 590 F.2d 604, 606–07 (5th Cir.1979); *United States v. Fike*, 449 F.2d 191, 192–93 (5th Cir.1971); *Bretti v. Wainwright*, 439 F.2d 1042, 1045–46 (5th Cir.1971).

■ McGill also contends that there was insufficient evidence to support his conviction. "The standard of review of the sufficiency of the evidence in a criminal case is whether a 'reasonable trier of fact could [have found] that the evidence establishe[d] guilt beyond a reasonable doubt.' " *United States v. Michelena-Orovio*, 719 F.2d 738, 742 (5th Cir.1983) (en banc), *cert. denied*, — U.S. —, 104 S.Ct. 1605, 80 L.Ed.2d 135 (1983). In addition to the facts outlined above, additional evidence adduced at trial tended to show that: (1) Holt paid for McGill's motel room; (2) a call was made from Holt's room to the 129 Roan Lane residence; (3) the M/V FORTY docked at 129 Roan Lane where her cargo of marijuana was unloaded.

■ McGill argues that Sgt. Stanley Hughes should not have been allowed to testify to the possible meaning of three words found on a sheet of paper in Merrill's possession. McGill maintains that the testimony was unreliable, did not assist the jury, and its prejudicial effect outweighed any probative value. Hughes had over seven years of experience with the Louisiana State Police performing investigative and undercover work in numerous smuggling conspiracies. Sgt. Hughes was qualified to render an opinion as to the meaning of the words "Phoenix", "Dragon", and "Home Place". The district court did not abuse its discretion in permitting the expert testimony. See *United States v. Carson*, 702 F.2d 351, 369 (2nd Cir.1983); *United States v. Alfonso*, 552 F.2d 605, 618 (5th Cir.1977).

When McGill was arrested, a "bearcat scanner" radio was seized. Officer Segur testified that when other officers pressed the buttons on the scanner the frequencies that appeared were used by local police, DEA, and U.S. Customs.

▇ McGill argues that the prosecution violated Federal Rule of Criminal Procedure 16(a)(1)(D) [1] by failing to produce the examination or test results showing that the radio was set on these frequencies. The government argues that this evidence does not fall within the scope of Rule 16(a)(1)(D).

Even if the government should have produced this evidence, the failure to do so does not merit a reversal unless the defendant can demonstrate prejudice. See *United States v. DeWeese*, 632 F.2d 1267, 1272 (5th Cir.1980); *United States v. Arcentales*, 532 F.2d 1046, 1050 (5th Cir.1976). Segur's testimony was subsequently struck from the record and the jury instructed to disregard it because he had no personal knowledge of the frequencies used by law enforcement agencies. Assuming there was a Rule 16 violation, we find no prejudice to McGill.

## B. ARTHUR DESROCHES, GARY MERRITT AND CORI DESROCHES

Arthur DesRoches, captain of the M/V FORTY, and his crew members, Gary Merritt and Cori DesRoches, contend that when state authorities stopped the M/V FORTY on Lake Ponchartrain there was an improper investigatory stop or illegal arrest and all evidence seized from the subsequent search of the vessel should have been suppressed at trial. The government argues that the stop was a proper investigatory stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) in which the Court noted: "[I]n determining whether [a] seizure and search were 'unreasonable' our inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, supra at 19–20, 88 S.Ct. at 1879.

At the time the local police stopped the M/V FORTY, they had received the tip from customs, the Robalo had just returned to the Fort Pike boat launch without lights after being on the lake for five to six hours, and Merrill, a suspected smuggler, was aboard the Robalo. Vessel traffic was light on Lake Ponchartrain at this time of night; the officers were justified in suspecting that the FORTY, a larger vessel in the same area of Lake Ponchartrain as the Robalo, had met with the Robalo and was engaged in a conspiracy to import marijuana. The officers flashed a blue light and directed the FORTY to stop. As the patrol boat pulled alongside the M/V FORTY, the officers detected the smell of pine oil. The officers were then informed that the vessel was from Miami and was diving for treasure. After obtaining this information police suspicions were aroused further so the officers asked the FORTY to follow them to Geohegan's Marina. All questions were asked by police from the patrol boat, and the FORTY followed the patrol boat to the marina. After the vessel docked at the marina, officers secured the vessel by directing the crew to produce any weapons on board, and requiring them to stand on the dock while officers made a cursory inspection for additional occupants aboard the vessel.

▇ As local police took these precautions, United States Customs agents arrived and requested documentation papers

---

**1.** Federal Rule of Criminal Procedure 16(a)(1)(D) states:

Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government, and which are material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial.

from Captain DesRoches.[2] Customs agents discovered marijuana gleanings in the hold while they were checking the main beam number. These gleanings were properly seized because they were discovered in plain view during a documentation check.[3] Upon discovery of the marijuana gleanings, officers placed DesRoches and his crew under arrest.

■ Police encounters with the public can be divided into three separate levels: (1) an officer may approach a citizen at anytime and pose questions so long as the citizen is not detained against his will; (2) an officer may seize a person if the officer has an "articulable suspicion" that the person has committed or is about to commit a crime; however, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop"; (3) an officer may arrest a suspect if the officer has probable cause to believe an offense has been committed or is being committed. See *Florida v. Royer*, 460 U.S. 491, 498–99, 103 S.Ct. 1319, 1324–25, 75 L.Ed.2d 229, 236–37 (1983).

■ The record fully supports the view that at the time the M/V FORTY was stopped the officers had an "articulable suspicion"—that the FORTY was engaged in drug trafficking. The officers were therefore justified in requiring the vessel to stop so the crew could be questioned. The responses to the questions added to the officers' suspicions so the FORTY was asked to go to a nearby marina. The district court's conclusion that the M/V FOR-TY voluntarily consented to go to the marina is not clearly erroneous. Once the vessel docked, the actions taken by officers in securing the vessel to assure their safety were reasonable and not so intrusive as to constitute an illegal search. See *Michigan v. Long*, —— U.S. ——, —— – ——, 103 S.Ct. 3469, 3481–82, 77 L.Ed.2d 1201, 1220–21 (1983); *Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977). After customs agents discovered the marijuana gleanings, they had probable cause to believe an offense had been committed and properly proceeded with an arrest. The record fully supports the trial court's denial of the defendant's motion to suppress.[4]

Serious questions are presented as to whether the evidence is sufficient to sustain the convictions of these three defendants.

The jury apparently concluded as it was entitled to do, that the FORTY accomplished its mission of delivering a load of marijuana to the Roan Lane residence. Maps and food aboard the vessel indicated that it had just arrived from South America. The jury probably concluded that it was unlikely that the FORTY sailed from Colombia to southeast Louisiana, unloaded, and then on some remote Lake Ponchartrain dock, found a fresh crew from Florida and the Virgin Islands. The FORTY had been unloaded only a matter of hours before she was stopped, and if the crew had been aboard when the vessel was unloaded the jury could have inferred their assist-

---

**2.** 19 U.S.C. § 1581 (1976) states:

(a) Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters or, as he may be authorized, within a customs-enforcement area established under the Anti-Smuggling Act, or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

**3.** See *United States v. Villamonte-Marquez*, 462 U.S. 579, —— – ——, 103 S.Ct. 2573, 2581–82, 77 L.Ed.2d 22, 32–34 (1983).

**4.** Patrick Murray and John Hartsel join Arthur DesRoches in asserting that the warrantless stop, arrest, and seizure of the M/V FORTY and its crew were unconstitutional. We reject these contentions for the same reasons stated above. Additionally, Hartsel points to no facts established in the record which gives him standing to claim a fourth amendment violation in connection with the seizure of evidence from the M/V FORTY. See *United States v. Salvucci*, 448 U.S. 83, 85, 100 S.Ct. 2547, 2549, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois*, 439 U.S. 128, 133–34, 99 S.Ct. 421, 424–25, 58 L.Ed.2d 387 (1978).

ance in discharging the cargo of marijuana. There was no evidence however as to when the crew boarded the vessel.

The district court concluded that with respect to the two crewmembers, Gary Merritt and Cori DesRoches, the absence of this link in the government's evidence was fatal; the trial judge reached a different conclusion, however, as to Captain Arthur DesRoches and found the evidence supported his conviction. We do not disagree with these conclusions.

We are called upon to decide as to each defendant, "whether the evidence, examined in a light most favorable to the government, was sufficient to support the jury's conclusion that the defendant was guilty beyond a reasonable doubt." *United States v. Varkonyi*, 611 F.2d 84, 85–86 (5th Cir.1980).

■ Except for the circumstantial evidence noted above, which pointed toward the improbability of a crew change following the time the marijuana was unloaded, the only evidence of involvement by the two crewmembers in the conspiracy was their presence aboard the FORTY. When the FORTY was stopped she had been unloaded and only minute quantities of marijuana were found. No evidence was admitted that either of the crewmembers made statements to the police which were untrue or reflected knowledge on their part that their vessel was engaged in illegal activity. The fact that Cori DesRoches was Captain Arthur DesRoches' brother and Vernon Holt's stepson is insufficient to bridge the gap in the evidence to support the jury verdict against Cori DesRoches. A thorough review of the record persuades us that the trial court correctly entered judgments of acquittal for Merritt and Cori DesRoches.

■ We also agree with the trial court that the evidence was sufficient to sustain Captain Arthur DesRoches' conviction. In addition to the circumstantial evidence which justified a jury conclusion that the crew had probably not been changed following the discharge of the cargo of marijuana, Captain DesRoches made at least two statements and took action which the jury was entitled to conclude was inconsistent with his plea of not guilty. First, the jury was entitled to conclude that Captain DesRoches lied about the mission of the FORTY when he told St. Tammany Parish police officers that the vessel was hunting for treasure in Lake Ponchartrain. The government established that even if it had been feasible to dive for treasure in Lake Ponchartrain the FORTY did not have the equipment to dive for treasure. Also, the jury was entitled to conclude that Captain DesRoches had directed the use of an inordinate amount of pine oil to wash down the decks of the vessel for the purpose of masking the odor of marijuana. Additionally, as Captain DesRoches and his crew were standing on the dock and while the customs officers were inspecting the vessel, DesRoches attempted to discard two business cards. Officers were successful in retrieving these items from the water where DesRoches had dropped them. They included Charles McGill's business card and the card of attorney Andrew Thornton (whose card was also held by Merrill).

We conclude that the record is sufficient to support Arthur DesRoches' conviction.

## C. PATRICK MURRAY A/K/A JAMES MURPHEY

■ Murray also challenges the validity of his arrest and the sufficiency of the evidence to support his conviction. On November 4, following the arrest of Charles McGill, Richard Merrill, and Vernon Holt and the crew of the FORTY, police learned that a call had been placed from Holt's motel room to the Roan Lane residence. The residence was already under surveillance for suspected narcotics activity unrelated to the acts of defendants in this case. Officers had observed John Hartsel and Patrick Murray a/k/a James Murphey at the residence. Murray was observed entering and leaving the residence several times. On November 4, between 11:00 a.m. and noon, government agents sensed that Murray had detected their surveillance and was fleeing the scene. An officer stationed a

quarter mile from the residence was ordered to arrest Murray as he departed the area. While Murray was stopped and searched, he informed officers that he had just stopped at 129 Roan Lane to ask directions. Murray was then placed under arrest and taken back to the residence. Murray contends that his arrest was illegal because at that time the only evidence that tended to link him to the conspiracy was a telephone call from the suspects at the Slidell Ramada Inn to the Roan Lane residence. We agree that the arresting officer did not have probable cause to arrest Murray.

■ After Murray's arrest, he was taken back to 129 Roan Lane. At the residence, Murray was informed of his *Miranda* rights and his right to refuse to permit officers to search his car. Murray then signed a consent to search form. Officers found $2,000 cash and an airline ticket in the trunk, and a rental agreement for the car in the glove compartment. In view of Murray's consent, the trial court did not err in admitting the evidence. See, e.g., *United States v. Troutman*, 590 F.2d 604, 606–07 (5th Cir.1979); *United States v. Fike*, 449 F.2d 191, 192–93 (5th Cir.1971); *Bretti v. Wainwright*, 439 F.2d 1042, 1045–46 (5th Cir.1971).

■ Sufficient evidence was produced to support Murray's conviction: (1) Murray owned the M/V FORTY, (2) a call had been placed from Vernon Holt's room to 129 Roan Lane, (3) Murray was present at 129 Roan Lane, (4) the M/V FORTY unloaded marijuana at the Roan Lane residence, and (5) 1,500 pounds of marijuana were discovered at the Roan Lane residence.

## D. JOHN HARTSEL

Hartsel also challenges the validity of his arrest and the sufficiency of the evidence to support the verdict. When Murray left the Roan Lane premises, officers decided to approach Hartsel in the front yard of the residence. As officers approached, Hartsel moved towards the house. Officers asked Hartsel to stop and as officers were asking questions, marijuana gleanings were discovered on the ground surrounding Hartsel. A closer investigation revealed particles of marijuana in the driveway and in the back of several trucks. Hartsel was then arrested and informed of his rights. In response to the question of whether marijuana was on the premises, Hartsel replied: "I didn't put it there." The premises were then secured and a search warrant was obtained. A search revealed approximately 1,500 pounds of marijuana in the home.

■ Hartsel argues that the police were trespassing on the premises and had no right to approach him in the yard in front of the Roan Lane residence. This contention is meritless. When an officer enters upon private property to perform his duty, his conduct, otherwise a trespass, is justified. See *United States v. Knight*, 451 F.2d 275, 278–79 (5th Cir.1971), cert. denied sub nom. *Grubbs v. United States*, 405 U.S. 965, 92 S.Ct. 1171, 31 L.Ed.2d 240 (1972).

■ We agree with the district court that sufficient evidence was adduced to convict Hartsel. This includes: (1) the telephone call from the suspects at the Ramada Inn to the Roan Lane residence, (2) the M/V FORTY discharged marijuana at Roan Lane, (3) Hartsel's extended presence at the residence, (4) evidence of marijuana on the premises, and (5) Hartsel's admission that he had knowledge of the presence of marijuana.

### III.

Accordingly, the convictions of Charles McGill, John Hartsel, Patrick Murray a/k/a James Murphey, and Arthur DesRoches are AFFIRMED and the acquittals of Gary Merritt and Cori DesRoches are AFFIRMED.