**UNITED STATES of America, Plaintiff,**

v.

**David Mark HOFFMAN, Defendant.**

**No. 82–CR–157.**

United States District Court,
E.D. Wisconsin.

Jan. 21, 1988.

590

Eric J. Klumb, Asst. U.S. Atty., Milwaukee, Wis., for plaintiff.

James Shellow, Shellow, Shellow & Glynn, Milwaukee, Wis., for defendant.

DECISION AND ORDER

TERENCE T. EVANS, District Judge.

David Mark Hoffman was indicted in December 1982 for illegally manufacturing, possessing, and distributing methamphetamines. He failed to appear in court and a warrant was issued for his arrest. He was arrested on the warrant four and one-half years later on May 14, 1987. He has since been recharged in a superseding indictment, which adds additional counts relating to alleged illegal activity in 1986.

On November 9, 1987, Magistrate Robert L. Bittner issued recommendations regarding various pretrial motions which Mr. Hoffman filed. The parties filed simultaneous objections to those recommendations. The following is a discussion of the orders

I will enter on the motions. In reaching my decision, I want to note that the issues have been very ably presented by Eric Klumb and Jeffrey Wagner for the government and Stephen Glynn, Robert Henak, and James McComas for the defendant.

*The Tripoli Farm Searches*

In the fall of 1986, one warrantless search and two other searches based on warrants were conducted at a farm on Tripoli Road in Lynne, Oneida County, Wisconsin. Hoffman contends that the warrantless search and the search based on the first warrant were illegal and that the evidence seized pursuant to the second warrant involved fruits of the first two searches. He seeks suppression of all evidence obtained in the Tripoli farm searches. Magistrate Bittner held an evidentiary hearing, and his recommendation denying suppression followed.

The facts show that the Tripoli farm was rented by Hoffman under the alias "William Brown" from May 1984 through September 1986. Hoffman lived in a residence on the property and allegedly set up a laboratory to manufacture illicit drugs in a somewhat dilapidated-appearing barn located 105 feet away from the residence. Hoffman had a number of security measures in place on the farm, including barriers in the driveway and the presence of dogs on the property.

The buildings were arranged so that the house was visible from the road, which was about 130 feet away. Behind the house were a shed and an outbuilding, and further back was the barn. The barn, as previously noted, was 105 feet from the rear of the house and 263 feet from the road. The grass surrounding the house and leading to the front of the barn was uniformly cropped. The grass on the three other sides of the barn was uncut.

Sometime before September 9, 1986, Duane Barnet, a meter reader for the Lake Superior Power and Light Company, relayed information about the farm to the Price County Sheriff's Department. Be-

cause the farm was located in Oneida County, the information was referred to the Oneida County Sheriff's Department. Barnet informed the sheriff's department of a sawhorse blocking the driveway and of numerous signs warning against trespass and warning of the presence of dogs. In addition, Barnet reported seeing a heavy electrical cable running from the house to the barn, and he noted that the consumption of electrical power at the residence was in excess of 1,000 kilowatt hours per month, an unusually high amount of electricity for farm property. Barnet knew the occupant of the premises as "William Brown." "Mr. Brown" had explained to Barnet that the heavy electrical cable was for his welder. There is some indication, although not undisputed in the record, that Barnet thought Brown acted strangely and that he seemed to be quite nervous. Barnet described "Brown" as 5'–10" tall, weighing approximately 160–170 pounds, having brown hair, and appearing to be in his late twenties or early thirties. Hoffman, by the way, according to the fugitive warrant, was 5'–10" tall, weighed 180 pounds, and was, in September of 1986, 27 years old.

The information led the sheriff's department to conduct an initial investigation. For the purposes of this motion, the crucial events occurred when Oneida County Deputy Sheriff James Adams[1] visited the area on September 16, 1986, to attempt to question the occupant or occupants of the farm. Deputy Adams first knocked at the front door of the house and, receiving no response, proceeded to the back door. He observed a van parked in the rear of the home and dogs running about the premises. He also observed a heavy electrical cable running from the house to the barn. He attempted to locate occupants of the residence by approaching a shed behind the house. The shed was locked. He then followed a path to the barn and went along a path beside the barn to its rear door. As he walked alongside the barn he smelled a chemical odor that he recognized from a

---

1. This case is complicated by the suicidal death of Deputy Adams on Christmas eve, December 24, 1986, just over three months after the searches and five months before Hoffman was arrested.

prior arrest as the odor involved in the manufacture of methamphetamine. He opened the unlocked rear door of the barn and observed what appeared to be a clandestine drug laboratory. He entered the barn and took a number of photographs with a 35mm camera that he regularly carried. Deputy Adams then left the farm and reported his observations to other sheriff's deputies.

The Wisconsin Department of Justice, Division of Criminal Investigation, was quickly consulted and agents were sent to assist the Oneida County Sheriff's Department in further development of the case. The farm was kept under constant surveillance, except for one brief period of less than one-half hour, between September 16 and September 21. On the afternoon of September 18 a man was seen walking around the premises and a van was driven away from the farm. The van (which was first observed by Deputy Adams) was registered to Dean Williams of Summit Lake, Wisconsin. The agents learned that Williams was the boyfriend of Holly Hagen and that Hagen was the mother of David Hoffman, a federal fugitive wanted on a 1982 warrant. Agents followed the van to Hoffman's mother's home. The next day agents followed the van, being driven by the same man, to Elcho, Wisconsin, where the driver was arrested. The agents believed the driver was David Hoffman but he turned out to be Hoffman's half brother, Dylan Reed.

Reed told the officers that he had seen David Hoffman two months earlier in Milwaukee, Wisconsin. He claimed that he had arrived in the Rhinelander, Wisconsin area on September 16 and had been staying with a friend named "Brian," whose last name he refused to reveal. He did not say he had been at the Tripoli farm. A search of the van produced two sheets of paper; one being a list of chemicals and the other a diagram of a chemical process, which Reed explained were copies of a recipe for an alcohol still which he had obtained from his half brother, David Hoffman.

After Reed was arrested, the surveillance of the farm continued and, although the officers did not observe anyone, the lights remained lit, and the dogs which ran free at the time of the van's departure continued to run at large.

Additionally, prior to an application being made for a search warrant, two photo arrays, each including a photograph of David Hoffman, were presented to meter reader Barnet as well as to two other persons who had met William Brown. None were able to identify Hoffman as William Brown.[2]

On September 20, 1986, an application for a search warrant for the Tripoli farm and all the structures on it was made to the Honorable Robert F. Kinney, Oneida County Circuit Judge. The stated purpose of the warrant was to search the premises to locate Hoffman and obtain evidence of the crime of harboring a federal fugitive. The application was based on an eight-page affidavit of Oneida Sheriff's Deputy James Purdy. The affidavit related information from meter man Barnet, the other citizen witnesses, the surveillance of the farm, and the arrest of Dylan Reed. There was no mention of Deputy Adams' discovery of the chemical laboratory in the barn. Rather, as to Deputy Adams' role, the affidavit states:

Affiant spoke to Deputy James Adams of the Oneida County Sheriff's Department who is believed truthful and reliable in that he is a fellow law enforcement officer. Officer Adams stated as follows: He had been conducting surveillance of the residence since September 16, 1986 and had not observed any activity at the residence but had observed some smoke coming from the chimney and that lights were being turned on and off and also observed a shadow moving about the house and that it appeared that the van located at the property had been moved about in the yard.

2. This is certainly not unusual nor is it inconsistent with "Brown" being Hoffman. Obviously, Hoffman's picture was pre-December 1982. It would be reasonable to expect that a person on the run from the police might alter his appearance to avoid identification. As to estimated height, weight, and age, however, "Brown" was very similar to David Hoffman.

Judge Kinney issued a warrant. Execution of the warrant, however, was delayed until the morning of September 21, 1986, to organize the search and to allow for a chemist and an evidence analyst from the state crime lab to come to the scene and participate in the events. During the search Hoffman was not found; however, the officers "found" the clandestine laboratory, as they undoubtedly expected to do given the fact that Deputy Adams had already discovered it and the fact that a chemist had been included in the search party.

After this search the officers applied for a second warrant. This warrant application was based on the testimony of DCI Supervisor Daniel G. Hughes, who testified regarding the observations he made in the barn during the execution of the first search warrant. The second search warrant was issued and the laboratory was seized and dismantled.

■ The searches raise a number of issues which Magistrate Bittner carefully and thoroughly analyzed. As a preliminary matter, he found that Hoffman had standing to raise the issue of the legality of the searches and that he enjoyed, despite his status as a fugitive, a constitutionally protected expectation of privacy in the farm where he lived. I agree with these conclusions. That is not to say, however, that those privacy expectations could not be constitutionally invaded, in some instances, without prior judicial approval. In other words, even though Hoffman had a constitutionally protected expectation of privacy in his house, the existence of an arrest warrant (even one that was over four years old) would have constitutionally permitted a police entry into that house without fresh judicial approval if they had reason to believe that he was there.

A central issue in this case involves Deputy Adams' warrantless activity on the farm property. The magistrate determined that Adams could go from the front to the rear of the house in an attempt to rouse the occupants. He could then observe the van and the dogs. Because he also saw well-trodden paths, he could reasonably believe, the magistrate concluded, that the premises were occupied, and he could proceed to the shed and then along the path to the barn. It was at the barn that he smelled the odor associated with the manufacture of methamphetamine. Up to this point, in the magistrate's view, Deputy Adams' activities were legal; it was, however, when he opened the door to the barn, entered it, and took the pictures that he violated Hoffman's constitutional rights under the fourth amendment.

As to the first search warrant, the magistrate concluded that the affidavit submitted in support of it demonstrated probable cause that Hoffman was on the farm property. However, the affidavit also, it was found, contained material misstatements of fact and omissions of fact, and thus the warrant that issued from it was in violation of the fourth amendment under the rationale of *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

Because the second search warrant was based on observations made during the execution of the first warrant, the magistrate concluded that it was invalid. But the magistrate then determined that, despite these irregularities, the "inevitable discovery" doctrine saved the search. The magistrate observed that because Deputy Adams' detection of the odor which he associated with methamphetamine was made before any fourth amendment violation occurred, and because it was sufficient to put the investigation into effect, the laboratory would inevitably have been discovered regardless of the violations which may have occurred. In fact, the magistrate went on to find that the detection of the odor by Deputy Adams was, by itself, sufficient to support a finding of probable cause to justify the issuance of a search warrant. In other words, the magistrate concluded that, because the actions of the authorities were legal up until the point that Deputy Adams stepped inside the barn, and Adams' observations up to that point would have supported the issuance of a search warrant even though that was not the basis on which the warrant was issued, the evidence

594

seized during the second search should not be suppressed. Despite these conclusions the magistrate was troubled by what he thought was the pretextual nature of the first search warrant—that is, that the officers contended that they were looking for Hoffman when they were apparently seeking to "rediscover" the chemical laboratory in the barn. I will comment on this point later in this decision.

The magistrate ultimately saved the search in this case by relying on the "inevitable discovery" rule. However, even a reliance on that rule requires a belief that what Deputy Adams did outside the barn was not in violation of Hoffman's fourth amendment rights. On this issue Hoffman argues that the barn and the environs between the barn and the house are part of the "curtilage" of his residence and that therefore Deputy Adams had no right to go "traipsing hither and yon" throughout the farmyard. Hoffman also argues, of course, that even if the environs were not part of the curtilage, Adams could not enter the barn. The government, on the other hand, argues that *United States v. Dunn,* —— U.S. ——, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), requires a conclusion that the barn is outside the curtilage, and therefore its entry by Adams did not violate the fourth amendment. The magistrate's view seems to be that this case is distinguishable from *Dunn,* that therefore the barn is within the curtilage, but that Deputy Adams could nevertheless legally walk up to it and make the observations and smell the air as he did.

To discuss this point, I return to the facts and a step-by-step analysis of how I believe the law, as announced in *Dunn* and other cases, applies to them.

When Deputy Adams first entered the farm on September 16, 1986, he was attempting to identify its occupants and ask questions about the somewhat suspicious circumstances that had been related by Barnet, the meter reader. It is not improper for a law enforcement officer who has received the kind of information Adams had to approach a house, knock on the door, and attempt to ask questions of the

occupants for the purpose of investigating that information. *See* W. LaFave, *Search and Seizure,* § 2.3(b) at 298 (1978). This activity is not improper because it is not a "search" as that term is used in cases that discuss the fourth amendment.

After Adams knocked on the front door and got no response, he went around to the back door of the house and again knocked and announced himself. It was not improper for him to go to the back door of the house for the purpose of attempting to contact an occupant to further his inquiry. *United States v. Merritt,* 736 F.2d 223, 232 (5th Cir.1984), *cert. denied,* —— U.S. ——, 106 S.Ct. 2250, 90 L.Ed.2d 696 (1986).

While he was legitimately on the premises for the entirely proper purpose of trying to locate the occupant, Deputy Adams saw a van with the driver's side window rolled down. He noted the license plate. Based on the presence of the van, Adams could reasonably believe that someone was on the premises. He observed a path running between the rear porch of the farmhouse to the barn door, and so he approached the barn, still looking for an occupant of the premises. Adams' actions were still clearly proper, as he was legitimately attempting to find someone to talk to.

As he approached the barn, Adams noticed a familiar odor, one which he had smelled earlier that year in an Oneida County Sheriff's Department investigation of a clandestine motor home methamphetamine drug laboratory. The odor was coming from the barn.

Adams approached the barn door, announced himself, and asked if anyone was there. He received no reply. He then opened the unlocked door and saw the laboratory. He passed through the doorway, took photographs of the interior of the barn, and left.

*Dunn* is the most recent Supreme Court case that discusses a situation similar to that presented here by the actions of Deputy Adams. The defendant in *Dunn* owned and lived on a 198 acre ranch in Texas. The ranch was surrounded by a perimeter fence. There were several interior fences, including one around the home. Federal

DEA agents suspected that a clandestine illegal drug laboratory was on the premises. The agents, without a warrant, invaded the ranch during the evening, crossed over four fences, walked under the overhang of a barn located about 50 yards from the house, shined a flashlight through some netting above the barn's closed gate, and saw the lab inside the barn. They did not enter the barn. They then left, returned two more times to make further observations, and then obtained a search warrant.

■ The Supreme Court, by a vote of 7 to 2, found nothing wrong with the warrantless activity. The central inquiry, the Court held, was whether the area searched harbored the "intimate activities" associated with home life. In discussing that point, the Court reviewed the ancient concept of "curtilage" because it plays a part, the Court explained, in interpreting the reach of the fourth amendment. Because in ordinary cases the fourth amendment extends protection to an area beyond the physical boundary of a home, the Court went on to discuss four nonexhaustive factors to be considered in defining the extent of that area which has come to be known as the curtilage of a home. The factors are the proximity to the home; whether the area is in an enclosure surrounding the home; the use to which the area is put; and the steps taken to ensure the privacy of the area.

In this case the barn area was approximately 105 feet from the home, a distance generally held to be outside the curtilage. *See United States ex rel. Saiken v. Bensinger*, 546 F.2d 1292 (7th Cir.1976), *cert. denied*, 431 U.S. 930, 97 S.Ct. 2633, 53 L.Ed.2d 245 (1977) (suggesting a "bright line" or *per se* curtilage boundary of 75 feet). Also, the distance here between the house and barn, 105 feet, is close to the distance between the two in *Dunn* where the barn was 150 feet from a fence encircling the home. Second, as in *Dunn*, the barn itself did not lie within any enclosure. Third, the facts regarding the barn that were known to Deputy Adams prior to his going to the area of it were that there was a large electrical cable running to the barn;

an occupant of the premises had said the cable was used for welding; the farm itself was using excessive amounts of electricity; and the barn, from the looks of it, and to borrow a phrase from *Dunn*, probably did not look like the kind of place that harbored "the intimate activity associated with the sanctity of a man's home...."

The fourth *Dunn* factor addresses the steps taken by a person to ensure the privacy of an area. In this case the defendant points to the following security measures which were implemented: sawhorse barriers across the driveway; No Trespassing signs; signs warning of the presence of dogs; and the presence of dogs. Hoffman argues that these precautions extended the protected "curtilage" to the entire area surrounding all of the farm structures. *Dunn* will not permit that kind of extension for, as noted in *Oliver v. United States*, 466 U.S. 182, n. 13, 104 S.Ct. 1735, 1743, n. 13, 80 L.Ed.2d 214 (1984), "the Framers did not intend that the Fourth Amendment should shelter criminal activity wherever persons with criminal intent choose to erect barriers and post 'No Trespassing' signs."

■ Considering the pronouncements in *Dunn*, it is easy to conclude that Hoffman's protected zone of privacy—his "curtilage"—did not extend as far as the area of the barn. He could have no reasonable expectation of privacy for fourth amendment exclusionary rule purposes in the area of the barn where Adams made his observations. And Adams' observations of the van, although made while he was in the curtilage of the residence, were legal as he was not in the process of conducting a search when he made them.

■ Which brings me to the question of the actual warrantless entry by Adams into the barn itself. While the preceding discussion of curtilage has some relevancy and is of some help in deciding fourth amendment claims, it does not follow with arithmetic precision that all things under all circumstances that are within the curtilage are protected and all things outside of it are not. This conclusion usually follows, however, because things outside a curtilage

are generally classified as "open fields" and considered fair game for the eyes of the law. But this, of course, is not always the case. Simply stated, a person can have a protected expectation of privacy in buildings (*i.e.*, barns, garages, boathouses, stables, etc.) that are located far outside the area of the curtilage of the home. So, the person who lives in Milwaukee can enjoy a reasonable expectation of privacy in a garage in Green Bay. Thus, the curious concept of curtilage, originally taken to refer to the land and buildings within the baron's stone walls, is of only limited help in deciding whether the barn in this case could be entered as it was without a warrant.

■ *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), makes it clear that the fourth amendment protects the areas of privacy upon which one justifiably relies. Simply stated, I find that Hoffman enjoyed an expectation of privacy in the barn. His fourth amendment rights were violated when Adams, without a search warrant or the conditions that would excuse getting one, entered it.

So now I move to the other entries into the barn, those with the search warrants, to see if they were legal. Like a piece of tissue caught on someone's shoe, however, the illegal search by Adams will tag along for the ride.

It is apparent here that when news of Adams' observations was revealed, someone thought there might be a problem if action was taken immediately. So, the police set out to try and build a case for obtaining a search warrant for the farm that would not rely on Adams' observations but would instead independently establish a basis for finding probable cause. After four days they went to Judge Kinney and presented their evidence which suggested that David Hoffman, a federal fugitive, was on the premises.

As an initial observation, I note that Adams' permissible activity on the property —particularly his inhaling of fumes—provided more than an adequate and legal basis upon which to start a surveillance and investigation of the farm and its occupants. And, even if no smells were detected, the fact that someone was probably there but refused to answer Adams' calls would have, when considered with Burnet's observations, prompted the police to look closely at the farm and what was going on there.

Next, I note that the affidavit of Officer James Purdy established a reasonable probability that Hoffman, a federal fugitive, was being harbored at the farm. Some of those facts are recited at pages 21–22 of the magistrate's recommendations. They will not be repeated here. Suffice to say that Judge Kinney, having reviewed the Purdy affidavit, correctly concluded that a search warrant for David Hoffman should be issued.

But now we must return to the nagging entry into the barn by Adams on September 16. The Purdy affidavit did not mention it or any of the other observations made by Adams. It did mention that Adams first saw the van, but that is not important, for his observations of it occurred before the illegal entry into the barn. Hoffman argues, and the magistrate agreed, that the first search warrant was obtained in violation of *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed. 2d 667 (1978), because material misstatements were made in and material information was omitted from the affidavit submitted in support of it.

In *Franks v. Delaware*, 438 U.S. 154, 155, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978), the United States Supreme Court held that the fourth amendment is violated by intrusions pursuant to warrants issued upon probable cause showings which contain "a false statement ... [made] knowingly and intentionally, or with reckless disregard for the truth." The rationale for this proposition is simple as it is central to effecting the purposes of the fourth amendment—

> Because it is the magistrate who must determine independently whether there is probable cause, it would be an unthinkable imposition upon his authority if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly

false statement, were to stand. beyond impeachment.

438 U.S. at 165, 98 S.Ct. at 2681.

The rationale of *Franks* applies to material omissions as well as deliberate false statements. *United States v. Williams,* 737 F.2d 594 (7th Cir.1984).

■ Under the *Franks* principle, suppression will follow where the defense demonstrates (1) a false statement or omission was contained in the affidavit underlying the warrant, (2) the false statement or omission was made by the affiant intentionally or with a reckless disregard for the truth, and (3) the false statement or omission was material in the sense that but for its inclusion or omission the probable cause showing would have been insufficient to support issuance of the warrant. *United States v. Balistrieri,* 779 F.2d 1191 (7th Cir.1985).

Hoffman identified seven alleged misstatements or omissions which caused, in his view, a *Franks* violation. The seven are listed at pages 23 and 24 of Magistrate Bittner's opinion. I assume that the magistrate found that items 4, 5, and 6 were not violations of *Franks*, and if he did, I agree. However, I disagree with his observation that items 1, 2, 3, and 7 were violations of *Franks*.

■ Items 2 and 3 relate to the fact that Judge Kinney was not told that meter reader Barnet and two other people, Sherry Moore and William Bierman, had not identified photos of David Hoffman as being the mysterious William Brown. Besides the point noted in footnote 2 on page 592, it is not at all uncommon for witnesses to be unable to pick out a photograph (especially one over four years old) of a person they have only had limited exposure to. This is especially so when a prior observation was not the kind that a witness realizes may be important to remember at a later time. There is nothing here on this point to indicate to me that Judge Kinney would have declined to issue the first warrant had he known about the photo displays.

Item 7 relates to the failure to mention, in the material submitted in support of the first warrant, the facts regarding Deputy Adams' actions on September 16, 1986. The omission of this material is quite understandable. If it had been included, of course, Mr. Hoffman would be arguing that the Purdy affidavit contained fruit of the poisonous tree. When it's omitted, he argues *Franks*. Either way, he'll have an argument here—that nasty piece of tissue continues to stick to the government's shoe —so what were the state agents to do?

■ It is not necessary to subscribe a sinister motive to the failure to include Adams' activity in the Purdy affidavit. The state agents could quite realistically have believed that some or all of Adams' actions were a significant problem. The agents apparently hoped that keeping Adams' activities out of their search request would prevent the request from being tainted.

Moreover, the omission of the Adams activity does not present a valid *Franks* challenge to the warrant. *Franks* requires that the misstatement or omission must be material in the sense that but for it, the probable cause showing would have been insufficient to support the issuance of the warrant. An omission of information presented in support of a warrant becomes a concern under *Franks* only when, to borrow from another area of criminal law, it is exculpatory. That is, the omitted material, if called to the attention of the judge, would have led to a conclusion that probable cause for the issuance of the warrant was not present. Just the opposite would have occurred here. Had the information from Adams been presented, Judge Kinney (who at this time would not have been concerned with how the evidence was gathered—that is a question to be decided later if a defendant claims his rights were violated) would have had no hesitancy at all in concluding that probable cause for the issuance of the warrant existed.

Although I conclude that the omitted Adams activity was not a violation of *Franks*, I do not think the situation was handled particularly well by the officers in charge of the investigation. Because the material was omitted, someone could argue

598

that they were trying to do an end run around Judge Kinney. To short-circuit that kind of claim, the officers should have included the Adams activity in the material submitted to the judge with a statement that they did not want it considered for any purpose but were disclosing it only to make a complete record of what had occurred and to foreclose a later claim that they had something to hide. Judges, of course, are often called upon to segregate evidence (we even instruct juries to disregard certain evidence) and Judge Kinney, I'm sure, could have done so here.

The last *Franks* item of concern to the magistrate was the statement that there was probable cause to believe that Hoffman was, at the time, on the farm. In a nutshell, the defendant contends that if the agents had told Judge Kinney everything they knew, he would not have believed that Hoffman was on the farm when the first search warrant was issued. I disagree.

■ Essentially, the magistrate concluded that the affidavit submitted in support of the first warrant omitted the negative photo spread evidence of Barnet, Moore, and Bierman and the fact that "there was no occupation of the Tripoli farm premises by anyone, during the thirty-six (36) hour period from the time Dylan Reed departed on September 18, 1986 until the time the search warrant application was made the evening of the 20th." I have already discussed why, in my judgment, the negative photo spread evidence did not have to be included, so I need say nothing more about it now. As to the other point, it fails to take into account and give credit to some rather significant observations made by agent Tom Fassbender during the course of his surveillance of the farm.

Agent Fassbender's statements, found at pages 5–7 of the Purdy affidavit, are that on the evening of September 18 he observed an individual walking around the residence on the farm. Several hours later, Fassbender saw a man leaving the farm in the van. That individual was ultimately followed to a residence in Summit Lake, Wisconsin, where surveillance was maintained throughout the night of September

18. The individual was arrested on the morning of September 19 and identified as Dylan Reed, Hoffman's half brother. Fassbender was present at the arrest and observed that Reed was not the same individual that he had seen the evening before, walking about the premises. Agent Fassbender's observations led the officers to believe, therefore, that there remained a second individual on the premises who, in light of the other facts set forth in the affidavit, was probably the defendant.

In the 36–hour period between Reed's departure from the farm and the issuance of the search warrant, continued surveillance saw no one come or go from the premises. The officers therefore could reasonably have believed that Hoffman was still on the farm. During this period of time, lights were on, smoke was observed coming from the chimney, and a number of dogs were seen running about.

Although no one was observed on the premises during the 36–hour period, it does not follow that no one was present. It must be remembered that Hoffman was a fugitive and would not be expected to be conspicuous, especially if he felt he was being watched. Indeed, someone apparently was on the premises on September 16, when Deputy Adams was there, and yet he was unable to get any response in spite of the fact that he had knocked on both the front and rear doors of the house and gone to the barn. This would give rise to the reasonable inference that whoever was on the premises was attempting to hide, again, an inference consistent with the defendant's status as a fugitive. Also, the aerial photographs submitted as evidence in this case demonstrate that, although surveilling officers may have been able to see occasional movement in the house, their vantage points would not have been such that they would be in a position to see routine activity inside the house, especially if the occupant were attempting to hide.

Finally, the defendant on this point would have me believe that the agents actually knew the farm was unoccupied when they applied for the warrant. I just don't believe that this was so. And the way the

search was executed suggests that the officers believed the farm was occupied—they approached it in a surreptitious manner armed with tear gas and shotguns, and they had a sniper positioned nearby.

So, I conclude that no *Franks* violation occurred and that the first search warrant was validly obtained. Which brings me to the final point, the magistrate's conclusion that the first search warrant was improperly issued because it "was a pretext used to rediscover the methamphetamine laboratory...." First, I fully believe that the officers here were eager to arrest David Hoffman and that they had a reasonable belief that he was on the farm. They also believed that evidence of harboring Hoffman as a fugitive was also there. I am equally convinced that the officers were eager to gain legal entry to the barn (they never denied this) so that they could legally observe the clandestine laboratory which they knew was present. The fact that they had a dual purpose does not make the warrant illegal or the evidence obtained suppressible under *Franks* or any other theory. In the context of a search warrant, it is permissible for searching officers to have an underlying auxiliary motivation to discover evidence other than that identified provided the scope of the search does not, as it did not here, exceed that which is authorized by the terms of the warrant. *See United States v. Kimberlin,* 805 F.2d 210 (7th Cir.1986).

The dual purpose for securing the first warrant here is also not objectionable because of the nature of the violation of the fourth amendment committed by Adams. The exclusionary rule has occasionally been criticized for suppressing truth because a constable has blundered. Here, Adams' actions were blunders as opposed to serious deliberate encroachments. After all, he walked into a barn, he didn't go into Hoffman's residence and go rummaging through his personal effects. If this were the Super Bowl Adams would have been penalized five yards for being offside, not forty yards for pass interference. The officers here were not required to call an end to this caper because it got

off to a shaky start. They were justified in trying to put it, legally at least, back together.

Accordingly, having found that the first search warrant was legal, it follows that the second one was also legal and that all of the evidence obtained as a result of the two will be admissible during Mr. Hoffman's trial. This conclusion makes it unnecessary to review the "inevitable discovery" rule ultimately relied on by Magistrate Bittner to recommend, in the final analysis, that the defendant's suppression motions be denied.

*Searches Following the Arrest*

Magistrate Bittner recommended suppression of documents seized following David Hoffman's arrest in Milwaukee on May 14, 1987.

Hoffman was arrested at a restaurant by federal Drug Enforcement Administration agents William Hehr and Lee Wayne Nicks. When he was arrested he was with Patricia McCann. The two were escorted out of the restaurant, and a pat-down search revealed a set of keys which fit a 1977 white Chevrolet van with a California license plate. Agents entered the van. The government contended that Hoffman consented to the search.

At the time, Hoffman and Ms. McCann were registered in a motel across the street from the place of the arrest. The motel room was also searched, and there is no contention that the agents requested permission for that search.

Four documents were seized during these events. The government contends the documents were seized from the van; Hoffman contends they were seized from the motel room. The magistrate found that the search of the van was legal under the automobile exception to the exclusionary rule but that the search of the motel room was not. He judged the credibility of the testimony given by McCann and Hoffman against that given by agent Nicks and judged the defendant's version to be more credible—that is, that the documents in question were seized from the motel room

rather than from the van. Accordingly, he ordered suppression of the documents.

In its objections to this recommendation the government contends that it was not prepared at the hearing for an allegation that the documents were found in the motel room rather than in the van. For this reason it did not call Hehr, who was the evidence custodian in this matter, for his testimony regarding where the items were seized. The government requests an opportunity to present the testimony of agent Hehr for establishing where the items were discovered. The government contends that Hehr's testimony would be brief and could be done just prior to trial.

I have no doubt that agent Hehr's testimony might be brief. However, because the issue involves the credibility of the agents on one hand and Hoffman and his witness on the other, and because I did not hear the testimony which was given before the magistrate, the hearing will necessarily be somewhat longer than the government indicates. However, I will allow, just prior to trial, testimony to be taken from both sides on the issue as to where the documents in question were seized. Until that hearing I will withhold a decision on this point.

*Remaining Motions*

Magistrate Bittner recommended denial of the defendant's motion to dismiss or in the alternative to strike count 7 of the indictment. He also recommended denial of Hoffman's motion for severance of the counts in the indictment. As to Hoffman's motion for a bill of particulars, the magistrate granted it as to identification of co-conspirators and denied it in all other respects. Hoffman's motion for the production of exculpatory evidence was denied.

With the exception of the motion for exculpatory evidence, I adopt the recommendations on these points. As to exculpatory evidence, the magistrate states that the government recognizes its continuing obligation to produce exculpatory evidence, and on that basis the motion was denied. Just as a technical matter I will grant the motion, with the understanding that the government recognizes its continuing duty to produce exculpatory materials.

The following orders are entered as indicated herein.

IT IS ORDERED that evidence seized as a result of the warrantless intrusion onto the Tripoli farm and the two search warrants for the premises is ADMISSIBLE except for the first entry into the barn by Officer Adams.

IT IS FURTHER ORDERED that a hearing will be held at the time of trial regarding the search of the van and the motel room at the time of Hoffman's arrest.

IT IS FURTHER ORDERED that Hoffman's motion to dismiss count 7 or alternatively to strike it is DENIED.

IT IS FURTHER ORDERED that Hoffman's motion for severance is DENIED.

IT IS FURTHER ORDERED that Hoffman's motion for a bill of particulars is GRANTED IN PART as indicated by Magistrate Bittner.

IT IS FURTHER ORDERED that Hoffman's motion for the production of exculpatory evidence is GRANTED.