**STATE of Utah, Plaintiff and Respondent,**

v.

**Mark Joseph SERY, Defendant and Appellant.**

**No. 860333–CA.**

Court of Appeals of Utah.

July 27, 1988.

Karen Stam (argued), Joan C. Watt, Salt Lake Legal Defender Assoc., Salt Lake City, for defendant and appellant.

David L. Wilkinson, Atty. Gen., Kimberly Hornak (argued), Asst. Atty Gen., for State.

Before JACKSON, ORME and DAVIDSON, JJ.

## OPINION

JACKSON, Judge:

Defendant Mark Joseph Sery appeals his conviction for unlawful possession of a controlled substance, a third degree felony, in violation of Utah Code Ann. § 58–37–8(2)(a)(i) (1986). We reverse the trial court's denial of defendant's suppression motion and remand for withdrawal of the plea of no contest underlying the judgment of conviction.

On May 22, 1986, Sery arrived at Salt Lake International Airport at 11:05 a.m. on a Delta Airlines flight from Florida. He was carrying a blue suitcase with brown trim; there was nothing unusual about his appearance or attire. He paused momentarily in the arrival gate area, looked around, waited a few minutes while other passengers passed him, and then started along the concourse, looked around again, and entered a snack bar. In a few minutes, he exited the snack bar with a soft drink. He walked directly across to a bank of pay telephones and sat down in one of the enclosures. While holding a phone receiver, he twice stood up and looked over the booth's partition. Within three to five minutes, he left the phone booth area by a different path than the one he used to enter it, rejoining the concourse past several men standing near the phone booths, and proceeded in the direction of the baggage claim area. At that point, he was stopped by three of the men who had been standing outside the phone booth area after following him from the arrival gate. They identified themselves to Sery as police officers. One was Agent Mark Whittaker of the Utah Narcotics and Liquor Enforcement Bureau; one was Sergeant William Pearson of the Miami, Florida Police Department.

The day Sery arrived, Sergeant Pearson was conducting a drug courier seminar for Salt Lake City police. The training session for twenty to twenty-five officers had moved out of the classroom and into the airport concourses for practical application. Approximately six officers were watching the deplaning of Sery's flight from Florida, including Pearson and Whittaker. As soon as Sery entered the terminal and looked around, Pearson said to trainee Whittaker, "Let's follow him" or "Let's take a look at him." When Sery emerged from the snack bar, Pearson was ten to fifteen feet away from him. While Sery was in the phone booth area, Pearson and several of the trainees stood watching him, some within five feet.

When Sery was first stopped for questioning by Pearson, Whittaker, and another trainee, Pearson asked to see his airline ticket. A ticket bearing the name of Sidsel was produced. Pearson returned the ticket and asked "Mr. Sidsel" for identification. Sery responded that he had none, that his name was not Sidsel, and that the name on the ticket was incorrect due to airline error. According to Pearson, he did not ask Sery for, and Sery did not offer, his correct name. Pearson asked for his destination, which Sery stated was Evanston, Wyo-

ming. Pearson then asked if he could search Sery's carry-on bag. Sery said he would rather Pearson did not. Pearson told Sery he was free to leave.

Sery continued on his way along the concourse, took the escalator down to the baggage claim area, waited for a few minutes, and then left the terminal. He re-entered the building at least once, looked around the baggage claim area, and exited again.

After releasing Sery, Pearson obtained from Delta Airlines—and checked out—the callback phone number that had been left when Sery's ticket was reserved. After discovering that the number in Ft. Lauderdale, Florida had been changed to a nonpublished number, Pearson ordered a drug detection dog from a local police department.

The dog and his handler arrived at the airport about noon. Shortly thereafter Pearson and other officers again confronted Sery, this time outside the terminal in the passenger pick-up zone. Pearson asked Sery to submit his carry-on bag to a drug detection dog sniff; Sery declined. Pearson then advised Sery that both he and his bag were being "detained" and that he would have to go back into the terminal with them while the bag was presented to the drug detection dog.

After the officers took Sery back inside the terminal, Pearson took Sery's bag, carried it behind the Delta ticket counter to a baggage area out of view and off-limits to the general public, and placed it in a four-bag lineup. The drug detection dog was brought in by his handler and reacted positively to Sery's bag. This information was conveyed by Pearson to Whittaker, who went to the public concourse area where Sery was being detained and informed him that he was under arrest.

A warrant to search the blue carry-on bag was subsequently issued based on Pearson's affidavit. It was found to contain cocaine. Sery moved to suppress this physical evidence on fourth amendment grounds because the officers, at the time they seized Sery and his bag outside the terminal, did not have specific, articulable facts warranting a reasonable suspicion that Sery was carrying illegal drugs in his bag. The trial court, after stating that the question was a close one, denied Sery's motion.

Sery then entered a plea of no contest to the offense of possession of a controlled substance. The plea was explicitly conditional on his preservation of the ability to appeal the court's suppression ruling and to withdraw the plea if it was determined on appeal that the motion to suppress should have been granted. A judgment of conviction was subsequently entered based on the conditional plea.

CONDITIONAL NO CONTEST PLEA

■ As a preliminary matter, we must address the State's claim on appeal that, although the prosecutor assented on the record to this conditional plea arrangement, the agreement was improper and mistaken. The State now asserts that, under Utah case law, a defendant who pleads no contest waives the right to appeal all pre-trial rulings.

The State argues that, under *State v. Beck*, 584 P.2d 870 (Utah 1978) (per curiam), and *State v. Yeck*, 566 P.2d 1248 (Utah 1977), a defendant cannot plead guilty and then base an appeal on alleged errors other than the voluntariness of the plea. In *Yeck*, the Utah Supreme Court concluded that, by entering a voluntary plea of guilty, the defendant had waived a trial and, with it, the right to claim on appeal that he was denied his right to a jury trial. Similarly, in *Beck*, the defendant's entry of a voluntary guilty plea to second degree murder, after a hung jury at his trial for first degree murder, was held to be a waiver of his claim on appeal that the facts underlying his arrest warrant did not constitute probable cause.[1]

Although neither of these Utah cases involved timely pre-trial suppression mo-

---

1. Furthermore, because Beck pleaded guilty to second degree murder and had no trial on that charge, he was precluded from challenging the sufficiency of the evidence at his hung jury trial on the first degree murder charge. *State v. Beck*, 566 P.2d at 872.

tions, they are consistent with the common-law rule that a voluntary guilty plea is a waiver of the right to appeal all nonjurisdictional issues, including alleged pre-plea constitutional violations. *E.g., Gordon v. State,* 577 P.2d 701 (Alaska 1978); *State v. Carter,* 151 Ariz. 532, 729 P.2d 336 (App. 1986); *State v. Coffin,* 104 Idaho 543, 661 P.2d 328 (1983); *State v. Rivers,* 226 Neb. 353, 411 N.W.2d 350 (1987); *Webb v. State,* 91 Nev. 469, 538 P.2d 164 (1975); *Vogel v. City of Myrtle Beach,* 291 S.C. 229, 353 S.E.2d 137 (1987); *Beaver v. Commonwealth,* 232 Va. 521, 352 S.E.2d 342 (1987), *cert. denied,* — U.S. —, 107 S.Ct. 3277, 97 L.Ed.2d 781 (1987). This general rule of appellate procedure has been applied in other jurisdictions to preclude appellate review of fourth amendment issues where the defendant entered an unconditional guilty plea after losing the suppression motion. *E.g., State v. Defoy,* 109 Ariz. 159, 506 P.2d 1053 (1973); *Waits v. People,* 724 P.2d 1329 (Colo.1986); *People v. New,* 427 Mich. 482, 398 N.W.2d 358 (1986); *State v. Schulz,* 409 N.W.2d 655 (S.D.1987); *State v. Armstrong,* 148 Vt. 344, 533 A.2d 1183 (1987). Because the conviction is based on the plea, rather than on the evidence defendant claims was obtained unconstitutionally, *State v. Turcotte,* 164 Mont. 426, 524 P.2d 787 (1974), the defendant who unconditionally pleads guilty forfeits the right to press his fourth amendment claim on appeal, just as constitutional rights can be forfeited by a failure to raise them in a timely fashion. 4 W. LaFave, *Search and Seizure* § 11.1(d) (2d ed. 1987) (citing Westen, *Away from Waiver: A Rationale for the Forfeiture of Constitutional Rights in Criminal Procedure,* 75 Mich.L.Rev. 1214 (1977)).

In Utah, this general rule regarding forfeiture of appellate review of an adverse ruling on a pre-plea motion to suppress

applies with equal force to a defendant who enters an unconditional no contest plea, which "if accepted by the court shall have the same effect as a plea of guilty...." Utah Code Ann. § 77–13–2(3) (1982). *Accord Cooksey v. State,* 524 P.2d 1251 (Alaska 1974); *Jackson v. State,* 294 So.2d 114 (Fla.App.1974); *People v. New, supra. But see City of Huber Heights v. Duty,* 27 Ohio App.3d 244, 500 N.E.2d 339 (1985) (unlike plea of no contest, guilty plea waives claimed errors in denial of suppression motion).

However, the aforementioned general rule is inapplicable where, as here, the plea entered by the defendant with the consent of the prosecution and accepted by the trial judge specifically preserves the suppression issue for appeal and allows withdrawal of the plea if defendant's arguments in favor of suppression are accepted by the appellate court. *See Oveson v. Municipality of Anchorage,* 574 P.2d 801, 803 n. 4 (Alaska 1978) (approving expressly conditional *nolo contendere* plea if resolution of reserved issue on appeal is dispositive, refining rule first announced in *Cooksey v. State, supra* ); *State v. Ashby,* 245 So.2d 225 (Fla.1971) (approving conditional *nolo contendere* pleas that reserve questions of law for appeal); *State v. Crosby,* 338 So.2d 584 (La.1976) (conditional guilty plea); *People v. Reid,* 420 Mich. 326, 362 N.W.2d 655 (1984) (approving conditional guilty pleas agreed to by defendant, prosecutor, and trial court if there could be no prosecution if defendant's fourth amendment claim is sustained on appeal).[2]

We believe the use of such conditional pleas by criminal defendants—if agreed to by the prosecution and accepted by the trial court—is a sensible and sound practice.[3] If

---

**2.** A few states have statutorily exempted alleged fourth amendment violations from the common-law waiver rule, specifically permitting appellate review of the denial of a suppression motion even though the judgment of conviction appealed from is based on the entry of a guilty plea. *E.g.,* Cal.Penal Code § 1538.5(m) (West 1982); N.Y.Crim.Proc.Law § 710.70(2) (Consol. 1984); Wis.Stat.Ann. § 971.31(10) (West 1985).

**3.** New York's statute, *supra* note 2, has been described by the United States Supreme Court as a commendable effort "to relieve the problem of congested trial calendars in a manner that does not diminish the opportunity for the assertion of rights guaranteed by the Constitution." *Lefkowitz v. Newsome,* 420 U.S. 283, 293, 95 S.Ct. 886, 891, 43 L.Ed.2d 196 (1975) (per Stewart, J.). One writer has argued that the United States Constitution compels courts to give defendants the option to plead conditionally guilty

a case ultimately hinges on the admissibility of evidence whose acquisition is challenged by the defendant on constitutional grounds, forcing the parties to go through an entire trial merely to preserve the suppression issue is a pointless and wasteful exercise. *See United States ex rel. Rogers v. Warden of Attica State Prison*, 381 F.2d 209, 214 (2d Cir.1967) (forced trial in these circumstances would be a "waste of time, money and manpower").

■ It is true that a conditional plea reserving a suppression issue for appeal does not have the complete finality of an unconditioned plea, but it still results in a judgment of conviction, not an interlocutory order. That judgment is as final as any conviction after trial that might be reversed on direct appeal. Note, *Conditional Guilty Pleas*, 93 Harv.L.Rev. 564, 574 (1980). *See People v. Reid*, 362 N.W. 2d at 660. The essence of the conditional plea

> is that the legal guilt of the defendant exists only if the prosecution's case rests on admissible evidence. The crux of the dispute is resolution of the alleged error on appeal, not factual guilt or innocence. The conditional plea is tailored to further the resolution of these specific issues at the reasonable expense of any state interest in obtaining finality in the proceedings. The plea continues to serve a partial state interest in finality, however, by establishing admission of the defendant's factual guilt. The defendant stands

guilty and the proceedings come to an end if the reserved issue is ultimately decided in the government's favor.

Comment, *Conditioned Guilty Pleas: Post–Guilty Plea Appeal of Nonjurisdictional Issues*, 26 UCLA L.Rev. 360, 378 (1978). We see no logical inconsistency between a plea that admits factual guilt— or refuses to contest it—and the preserved claim on appeal that the government is constitutionally barred from being able to prove its case because of the illegal seizure of evidence.

We hold that conditional pleas of the sort in issue here, when agreed to by the defendant and the prosecution and approved by the trial court, are permissible in Utah even though they are not specifically authorized by the statutes governing the entry of pleas by criminal defendants.[4] *See* Utah Code Ann. § 77–13–1 (1988); Utah Code Ann. §§ 77–13–2, –3, –6 (1982); Utah Code Ann. § 77–35–11 (1988). Conditional plea agreements were accepted by the state courts in *Oveson, Ashby, Crosby,* and *Reid,* cited above, despite the absence in those jurisdictions of any authorizing court rule or statute. They were also accepted by two federal circuits long before the 1983 adoption of Fed.R.Crim.P. 11(a)(2), which for the first time affirmatively authorized conditional pleas of guilty or *nolo contendere* that preserved a federal defendant's right to appellate review of adverse pre-trial rulings, including those on fourth

---

because an unconditional plea system needlessly burdens fourth amendment rights by forcing the defendant to choose either the benefits of plea bargaining or preservation of the constitutional issues for appeal. Note, *Conditional Guilty Pleas*, 93 Harv.L.Rev. 564, 577–85 (1980). The four main arguments against the conditional plea practice were analyzed and rejected by the drafters of the current rule governing federal criminal procedure. Fed.R.Crim.P. 11(a)(2) advisory committee notes, *reprinted in* 3A C. Wright, *Federal Practice and Procedure* 77–80 (Supp.1987). *See also* Comment, *Conditioned Guilty Pleas: Post–Guilty Plea Appeal of Nonjurisdictional Issues*, 26 UCLA L.Rev. 360, 375–82 (1978).

4. We recognize that some state courts have refused to permit the defendant, the prosecution, and the trial judge to make such conditional plea agreements without a specific authorizing

statute or court rule. *See, e.g., State v. Arnsberg,* 27 Ariz.App. 205, 553 P.2d 238 (1976); *State v. Dorr,* 184 N.W.2d 673 (Iowa 1971) (conditional plea reserving search and seizure issues for appeal is unauthorized interlocutory appeal); *State v. Turcotte,* 164 Mont. 426, 524 P.2d 787 (1974) (conditional guilty plea agreement is not statutorily authorized and cannot be used to preserve fourth amendment issue for appeal). Unlike our dissenting colleague, however, we do not construe the absence of any mention of conditional pleas in Utah Code Ann. § 77–35–11 (1988), Utah R.Crim.P. 11, as an affirmative bar to such arrangements. Indeed, the Utah Supreme Court recently approved of a guilty plea conditioned on the imposition of an agreed-upon sentence although Rule 11 makes no mention of *any* type of conditional plea. *State v. Kay,* 717 P.2d 1294 (Utah 1986).

amendment issues. *See United States v. Moskow,* 588 F.2d 882 (3d Cir.1978); *United States v. Burke,* 517 F.2d 377 (2d Cir. 1975) (pre-trial motion to suppress).[5] More recently, the defendant in *United States v. Place,* 462 U.S. 696, 700, 103 S.Ct. 2637, 2641, 77 L.Ed.2d 110 (1983), had pleaded guilty but expressly reserved the right to appeal the denial of his suppression motion. The United States Supreme Court tacitly approved of that conditional plea practice, notwithstanding the lack of any authorizing statute or rule, by addressing the merits of the fourth amendment issue and affirming the Second Circuit's reversal of the trial court's denial of defendant Place's motion to suppress.[6]

Unlike the defendants in *Beck* and *Yeck,* Sery did not forfeit his claim that he was seized in violation of the fourth amendment by entering an unconditional plea. Instead, he specifically preserved that claim as part of the plea agreement. The prosecution agreed to that condition on the record; the court accepted the agreed-upon conditional plea. The defendant relied thereon and proceeded accordingly. Inasmuch as the court and counsel agreed on the procedure and it is not otherwise prohibited, we find no error.

### SEIZURE OF DEFENDANT

■ The fourth amendment to the United States Constitution, applicable to the states through the fourteenth amendment, *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court first recognized a limited exception to the fourth amendment's requirement that all "seizures" of persons must be based on probable cause. Since the intrusion in *Terry* involved a brief "stop and frisk" for weapons, and not an arrest, the Court held that probable cause was not necessary. Nonetheless, in order to justify under the fourth amendment even this lesser intrusion, *Terry* held that the police officer must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1879. The Court pointed out that this requirement of specificity in the information upon which police action is predicated is "the central teaching" of its fourth amendment jurisprudence. *Id.* at 21 n. 18, 88 S.Ct. at 1880 n. 18. It enables a reviewing court to assess the reasonableness of the police action against an objective standard, not the subjective good faith of the individual officer.

The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective stan-

---

**5.** *Contra United States v. Matthews,* 472 F.2d 1173 (4th Cir.1973); *United States v. Swann,* 574 F.2d 1316 (5th Cir.1978) (conditional pleas inappropriate in absence of authorizing rule or statute); *United States v. Clark,* 459 F.2d 977 (8th Cir.1972); *United States v. Benson,* 579 F.2d 508 (9th Cir.1978) (conditional plea has no statutory basis and is contrary to prior United States Supreme Court decisions); *United States v. Brown,* 499 F.2d 829 (7th Cir.1974) (conditional plea logically inconsistent and thus improper).

**6.** Previously, the Supreme Court had considered and rejected on the merits a defendant's claim that his prosecution was barred by the statute of limitations, even though he had pleaded *nolo contendere* after his motion to dismiss was denied by the trial court. *Jaben v. United States,* 381 U.S. 214, 85 S.Ct. 1365, 14 L.Ed.2d 345 (1965). As the court in *United States v. Doyle,* 348 F.2d 715, 719 (2d Cir.1965), pointed out, the record in *Jaben* showed that defendant's plea was explicitly conditioned on the right to appellate review of the limitations issue.

dard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate? Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction. And simple " 'good faith on the part of the arresting officer is not enough.' ... If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers and effects,' only in the discretion of the police."

*Id.* at 21–22, 88 S.Ct. at 1879–80 (citations and footnotes omitted). *See State v. Trujillo,* 739 P.2d 85, 88 (Utah App.1987). Stressing that each case must be decided on its own facts, the *Terry* court concluded that the limited stop and frisk was justified where "a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity is afoot...." *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884. This language in *Terry* is now referred to as the "reasonable suspicion" test, *see, e.g., United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), and has been codified in this state in Utah Code Ann. § 77–7–15 (1982).[7]

A temporary detention or seizure is "justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime." *Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion). Based on the totality of the circumstances, the detaining officers must have a particularized and objective basis for suspecting criminal activity by the particular person detained. *United States v. Cortez,* 449 U.S. 411, 417–18,

101 S.Ct. 690, 694–69, 66 L.Ed.2d 621 (1981). *See State v. Mendoza,* 748 P.2d 181, 183 (Utah 1987).

On appeal, Sery argues that his detention by Pearson and the other officers, after being stopped the second time outside the terminal, constituted an arrest unsupported by probable cause. Alternatively, defendant asserts that the detention constituted a seizure within the meaning of the fourth amendment that was unlawful because not based on Pearson's reasonable suspicion of criminal activity. In its brief, the State denies that the detention was an "arrest" for which the fourth amendment requires probable cause. However, the State agrees that Sery was "seized" for fourth amendment purposes when he and his bag were detained by the officers for the canine drug check. *See United States v. Place,* 462 U.S. 696, 708–709, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1983); *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.) (person is "seized" if, in view of all the circumstances, a reasonable person would have believed that he was not free to leave). But the State claims the seizure was not unconstitutional because Pearson had the necessary reasonable suspicion of criminal activity to conduct the type and length of detention to which Sery was subjected. In view of the State's position, if we conclude that there was not a sufficient basis for even a *Terry* stop, we need not consider whether there was probable cause to support an arrest.

The trial court determined that the articulable facts known to Pearson supported a reasonable suspicion of criminal activity by Sery when he and his bag were seized outside the terminal. Assuming that Sery's detention was an investigatory stop and not an arrest requiring probable cause,[8] the threshold issue is whether this determination is clearly erroneous. *Men-*

---

**7.** That statute provides:

A peace officer may stop any person in a public place when he has a reasonable suspicion to believe he has committed or is in the act of committing or is attempting to commit a public offense and may demand his name, address and an explanation of his actions.

Utah Code Ann. § 77–7–15 (1982).

**8.** The United States Supreme Court has recently acknowledged that its prior decisions "may in some instances create difficult line-drawing problems in distinguishing an investigative stop from a *de facto* arrest." *United States v. Sharpe,*

*doza,* 748 P.2d at 183 (citing *Cortez,* 449 U.S. at 416, 101 S.Ct. at 694). The trial court's finding is clearly erroneous only if it is against the clear weight of the evidence or if we reach a definite and firm conviction that a mistake has been made. *State v. Ashe,* 745 P.2d 1255, 1258 (Utah 1987); *State v. Walker,* 743 P.2d 191, 193 (Utah 1987). We need not examine the reasonableness of the nature, duration and scope of the detention and investigation unless we first conclude that the seizure was constitutionally valid at the outset. *See United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985).

We conclude that the articulable objective facts known to Sergeant Pearson when he seized Sery and his bag did not support a reasonable suspicion that Sery was engaged in criminal activity. Accordingly, the trial court's denial of defendant's motion to suppress the evidence found in his bag was clearly erroneous.

Seven facts were enumerated by respondent in support of the reasonableness of Pearson's suspicion:[9] (1) Sery arrived from Florida; (2) waited a few minutes at the gate and looked nervously around there and before entering the snack bar; (3) went to a telephone booth and twice stood up and looked in the direction of the officers;

---

470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). In another airline passenger detention case, the Fifth Circuit Court of Appeals has stated that, except in the context of border searches, successive investigatory stops of an individual based on the same information strongly indicate that an arrest requiring probable cause has taken place:

> The coercion inherent in the successive stop situation must be acknowledged. Otherwise, an intrusion which can be much more severe than an actual arrest will be allowed to take place on the basis of much less justification. *United States v. Morin,* 665 F.2d 765, 769 (5th Cir.1982).

**9.** The United States Supreme Court has scrutinized stops of airline passengers exhibiting "drug courier profile" characteristics in three cases. *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam); *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). More recently, in *Florida v. Rodriguez,* 469 U.S. 1, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984) (per curiam), the Court ruled on a *Terry* stop in an airport that was apparently not initiated based on a match-up with formal profile characteristics.

In *Mendenhall,* the facts relied on by agents for their suspicion of criminal activity were: defendant arrived from Los Angeles; was the last to leave the plane; appeared nervous; scanned the arrival area; did not claim luggage; and changed airlines. The Court did not reach a consensus on the appropriate reasoning to the result reached. Two of the majority held there was no seizure because the entire encounter with the agents was consensual; the reasonable suspicion issue was not reached by them. The three concurring justices assumed there was a *Terry* seizure and found reasonable suspicion. The four dissenters felt there was a seizure without reasonable suspicion of criminal activity. In *Reid,* the agent was held to lack any reasonable suspicion based on the facts that defendants: arrived from Ft. Lauderdale; in the early morning; with only carry-on bags; and appeared to the agent to try to conceal their travel together. In *Royer,* a plurality held the police conduct exceeded the permissible scope of a *Terry* investigative stop, turning the encounter into an arrest for which there was no probable cause. The four dissenters concluded there was reasonable suspicion for defendant's stop based on the facts that he: carried two heavy American Tourister bags; was young; casually dressed; appeared nervous; looked around; was flying out of Miami, a major drug distribution center; paid for his ticket with small bills; did not complete the baggage ID tag; and traveled under an assumed name. Finally, in its per curiam decision in *Rodriguez,* the Court assumed there was a seizure of defendant but held it was justified by an articulable suspicion of criminal activity because defendant had: spoken furtively with his confederates after spotting the plainclothes officers; was told by one confederate to "Get out of here"; attempted to evade the officers; and gave contradictory statements concerning his identity during the consensual encounter before the seizure. These results have led one noted commentator to conclude:

> From *Reid, Mendenhall, Royer* and *Rodriguez,* it cannot be said with assurance what combination of factors from the "drug courier profile," if any, will suffice to justify a *Terry* stop. But some conclusions may be reached from these decisions. For one thing, the fact the traveler has come from a "major source city" is of *some* significance, but—for the reasons stated in *Reid*—is hardly a weighty factor. Clearly that factor alone will not justify a stop. Nor will that factor suffice in conjunction with some other circumstance which is highly ambiguous, such as that the traveler appears nervous.

3 W. LaFave, *Search and Seizure* § 9.3(c) (2d ed. 1987) (footnotes omitted).

(4) took a strange route from the phone booth area back to the concourse; (5) possessed a plane ticket on which he claimed his name had been inaccurately recorded; (6) told Pearson he had no identification on him; and (7) left a telephone number with the airline reservationist that had been changed to an unpublished number.[10]

10. Sergeant Pearson disclaimed any use of a drug courier profile as the basis for his stops of Sery. Nonetheless, the facts he relied on closely parallel the characteristics listed in a typical drug courier profile. A useful and enlightening empirical analysis of drug courier profile characteristics appears in Cloud, *Search and Seizure by the Numbers: The Drug Courier Profile and Judicial Review of Investigative Formulas*, 65 B.U.L.Rev. 843 (1985). The author selected ninety different reported opinions from state and federal appellate courts involving 103 defendants. The opinions studied were issued by twenty-seven different courts during the period from August, 1975 through December, 1983. *Id.* at 888. The methods employed were designed to yield fact-based information providing insight into the use of the drug courier profile and its impact on judicial decision-making. The study presents a comprehensive overview unavailable to courts reviewing the facts of individual cases and calls for additional scrutiny of the profile using other systematic methods:

> The drug courier profile has never been subjected to [a] process of validation. The government has not conducted any systematic study to determine whether the drug profile has any predictive validity. Indeed, the only evidence of its effectiveness has generally been the testimony of agents who utilize the profile in the field. This testimony is typically deficient because even when agents "were recognized as having made stops in a substantial number of past instances where their suspicions proved to be correct [there was no] evidence as to the number of instances in which innocent passengers had been subjected by them to investigatory stops."
>
> ... In the rare instances where the government has provided non-anecdotal evidence purporting to establish the profile's validity, the information has been facially deficient. In particular, the data fails to account for all profile-related police encounters with air travelers and provides no evidence indicating that the profile accurately distinguishes drug couriers from innocent passengers.

*Id.* at 875–76 (quoting *United States v. Place*, 660 F.2d 44, 48–49 (2d Cir.1981), *aff'd*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)). We share the author's concerns about the reliance on drug courier profiles by police and reviewing courts. No litmus-paper test can determine whether the police possessed sufficient facts to justify a person's seizure. *Id.* at 857. The profile formula is such a test. If (a) courts accept the premise that the profile works accurately, i.e., identifies couriers and (b) the government shows a trained agent has conformed the traveler to the profile, the courts' reviewing function is virtually eliminated. *Id.* The agent's behav-

ioral interpretation supplants court review because his claims become self-verifying.

Cloud's analysis yielded these conclusions about the following frequently occurring shared profile characteristics, similar to the seven facts enumerated by the State in the case before us: (1) Arrival from or Travel to Drug "Source City" or Drug "Use City": The results indicate that the cities of arrival or destination of drug couriers (for those defendants arrested before their flights were completed) are dispersed throughout the country. *Id.* at 901. "[I]f every area of the nation is suspect [as a drug use location], then every air traveller is potentially a suspect merely by virtue of traveling between two locations." *Id.* at 900. Furthermore, "drug traffickers may travel to any city in the nation. Suspicion surely cannot attach to a traveler simply because he is going somewhere." *Id.* at 902. (2) Nervousness:

> According to the police ... 50.5% of the defendants exhibited pre-contact nervousness. Although nearly one-half of the defendants did not conform to [this characteristic], the data suggest that it is one of the most significant characteristics to the police. Unfortunately, it is also the most subjective of the characteristics comprising the formal profiles.

*Id.* at 903. (3) Using Telephone Upon Arrival: More drug couriers did not make telephone calls than did. Phone calls were made by only 19.4% of defendants in the studied cases. *Id.* at 906. (4) Unusual Itinerary: Place-to-place travel by an unusual itinerary (not within the terminal, as with Sery), such as rapid turnaround time, is a characteristic in one standard drug courier profile. Yet only 17.5% of the studied defendants were described as traveling with a fast turnaround time. *Id.* at 909. (5) Use of an Alias: Police learned of an alias *before* making investigative contact with only 3.9% of defendants. Officers learned during the initial contact that 21.4% of the suspects were not using aliases, yet continued their investigations. *Id.* at 905–06. (6) Left False Telephone Callback Number with Airline: Leaving a false number may be suspicious because it leaves no record for use in tracing suspects, yet it was attributed to only 11% of the defendants. The reliability of this characteristic is doubtful, since substantial record-keeping problems exist that increase the possibility of a false number report. Any error in reciting the number to the airline, or by the airline in receiving, recording or retrieving, or by the police in doing the same (or in dialing) could lead investigators to conclude incorrectly that the traveler had left a fake number. *Id.* at 907.

Although the government may present a lengthy list of detailed observations, the courts are not relieved of their duty to review the list critically and decide whether each particular observation cited actually contributes something to the "whole picture"—that is, whether the particular observation bears any reasonable correlation to a suspicion that the person presently is engaged in criminal activity.

*United States v. Sokolow,* 831 F.2d 1413, 1418 (9th Cir.1987).

In *State v. Mendoza,* 748 P.2d 181 (Utah 1987), the Utah Supreme Court reviewed the constitutional validity of an investigatory vehicle stop preceding a search that yielded marijuana. There, seven facts were articulated by the officers in support of the reasonableness of their suspicion: (1) the occupants appeared to be of Latin descent; (2) route of travel; (3) time of day; (4) time of year; (5) California license plates; (6) an erratic driving pattern; and (7) nervous behavior. A comparative analysis with *Mendoza* is illuminating. We begin with "nervousness," the second Sery fact and the last *Mendoza* fact.

### A. "Nervousness"

In *Mendoza,* the officers' conclusion of nervousness on the part of the car occupants was based on a "white-knuckled," rigid look and failure to make eye contact. Those descriptions were not given any weight by the court in determining if the officers had a reasonable suspicion to conduct an investigatory stop. *Id.* at 184.

Here, there was no attempt by Pearson to articulate any specific objective fact underlying his subjective conclusion, other than to say that Sery was "looking around," [11] something many passengers do when they first reach the arrival gate, especially if they expect to be met by someone and that person is not readily seen. Pearson did not claim that Sery's "looking around" was in any way unusual for an arriving passenger. No observations of "nervousness" were made either when Sery was first approached and questioned by the identified officers or later when he was detained. His responses indicate calm and deliberate behavior rather than agitation and apprehensiveness. The fact that Sery was still waiting at the airport an hour after being followed from the arrival gate and then questioned by police belies the nervous label. Sery did not take flight or behave as if he was avoiding apprehension, as would be expected of the truly nervous suspect.

Nervousness is the most subjective of the characteristics relied on here. Cloud, *Search and Seizure by the Numbers: The Drug Courier Profile and Judicial Review of Investigative Formulas,* 65 B.U. L.Rev. 843, 903 (1985). If the officer cannot articulate the unusual mannerisms or actions by the defendant that led to a conclusion of nervousness, it is impossible for any reviewing court to determine, after the fact, whether the person's apparent nervousness was any different from that observed in countless travelers—or if the nervousness existed at all. [12] *See id.* In

---

**11.** Pearson's description of Sery's nervousness is remarkably similar to that used by drug agents to describe the behavior of the defendants stopped in *Mendenhall,* 446 U.S. at 547 n. 1, 100 S.Ct. at 1873 n. 1 (deplaning defendant "appeared to be very nervous" and "completely scanned the whole area where [the agents] were standing"), and *Royer,* 460 U.S. at 493 n. 2, 103 S.Ct. at 1322 n. 2 (defendant "appeared pale and nervous, looking around at other people"). These cases illustrate the ease with which agents may make an after-the-fact subjective assertion fitting the suspect into a mode of criminality.

**12.** In *United States v. Sanford,* 658 F.2d 342, 345 (5th Cir.1981), *cert. denied,* 455 U.S. 991, 102 S.Ct. 1618, 71 L.Ed.2d 852 (1982), the famous drug agent Markonni had asserted he could distinguish innocent nervousness from criminal

nervousness. Pearson did not describe Sery's looking around as unusually nervous; his use of this human characteristic must rest on the presumption that drug couriers, afraid of discovery, act differently from innocent travelers and exhibit increasingly nervous behavior when watched, approached, or questioned. The necessity for the officer to make an on-the-spot evaluation of a person's psychological state portends enormous potential for subjective abuse. Air travel frequently involves events and human feelings which spawn nervous and perhaps "suspicious" behavior. Some examples are: frightening, cancelled, or delayed flights; missed connections; late arrivals causing missed appointments; lost tickets or baggage; and dashed expectations of being met by someone. To this list of quotidian travel traumas, we would add:

fact, Pearson testified that Sery's behavior was not unusual, i.e., no different than that of other deplaning passengers. The officer's mere conclusion regarding defendant's nervousness, unsupported by relevant objective facts, can have no weight in determining if he had a reasonable suspicion of criminal activity. *Cf. State v. Dorsey*, 731 P.2d 1085, 1088 (Utah 1986) (officer's determination of probable cause justifying a warrantless vehicle search must be evaluated in light of his or her experience and training "where there are objective facts to justify the conclusion").

### B. Itinerary

In *Mendoza*, the car occupants' route of travel and California license plates were found to have little probative value in determining whether the officers had a reasonable suspicion justifying the stop of the car. *Mendoza*, 748 P.2d at 183. Those facts are similar to the fact that Sery came to Utah on a Delta flight originating in Florida, which likewise has little probative value. The record does not clearly show the city in Florida from which Sery came. Pearson testified, very generally, that Miami is a known source of the supply of drugs for the west coast. He also testified he was watching Sery's flight with the trainees because "Florida is a known source of, specifically, cocaine and marijuana to the western and northwestern United States." There was no testimony that Sery's particular route of travel (somewhere in Florida to Atlanta to Salt Lake City) or flight was frequently used to transport illegal drugs to Utah, while in *Mendoza* the officers testified Interstate 15 was frequently used by illegal aliens from Mexico. *See id.* Salt Lake City is a major hub for airline flights to and from many places. In *Mendoza*, the court considered it unlikely that illegal alien transporters comprised a significant portion of I–15 traffic. It seems equally unlikely that drug couriers comprise a significant portion of the travelers through Salt Lake International Airport, even of those whose flights originated in Florida.

being watched, followed, or accosted by un-

The officers testified in *Mendoza* that they relied on "erratic" driving behavior in the form of failure to yield lane, change of lane, and rapid deceleration; the court, however, could not see how this behavior could reasonably give rise to a suspicion that the car occupants were engaged in illegal activity. *Id.* at 184. Here, Pearson attached significance to the fact that Sery sat down in a phone booth and twice stood up and looked over the dividing partition. We fail to see, and Pearson did not say, how this behavior varies from that of any other arriving passenger who keeps looking around the terminal area for whoever was supposed to meet him or her at the arrival gate, or who looks around in search of someone who might be willing to provide the change necessary to complete the telephone call. *See Reid*, 448 U.S. at 441, 100 S.Ct. at 2754 (all but one of the characteristics relied upon by the detaining officers "describe a very large category of presumably innocent travelers").

Pearson also found it "strange" that Sery left the bank of phone booths by a different path than the way he had entered it, rejoining the main concourse hallway at a point that was "beyond" Pearson and the trainees but, presumably, further along Sery's route down the concourse. This path was strange, Pearson asserted, because Sery "kind of edged his way between the glassed-in wall area and pay phones." Neither the trial court nor counsel asked Pearson to diagram the scene or add flesh to his cursory account by giving the actual layout and dimensions of the space or the location of the officers. The record shows that, while Sery was in the phone booth, some of the surveilling trainees were within five feet of him. The path chosen by Sery could have been the one most available to him if the officers were blocking the route by which he had come.

### C. Name Discrepancy

Furthermore, Pearson did not articulate, and we cannot discern, any special meaning that should be given to the error Sery claimed the airline made in the name in which they issued his ticket. This fact is

known persons for unknown reasons.

transformed by the State in its brief (and, notably, not by Pearson at the suppression hearing) into the "fact" that Sery was traveling under an "assumed name," one of the facts the United States Supreme Court has suggested could, in tandem with other relevant facts, justify an investigative detention of a passenger and his luggage. *Royer*, 460 U.S. at 502, 103 S.Ct. at 1326.

Pearson testified that, after Sery told him his name was not what appeared on the ticket,[13] he did not ask Sery for his correct name and Sery did not offer it. Although Pearson asked Sery to produce some identification other than his ticket, Sery replied that he had none.[14] The officer thus had nothing with which he could compare the name on the ticket. Pearson stated he did not know defendant's real name until after Sery was arrested by Whittaker. He, therefore, did not know and could not have known until after the seizure whether defendant was using an assumed name, as opposed to a misspelled name on the ticket due to travel agent or airline error. *Cf. Mendenhall*, 446 U.S. at 548, 100 S.Ct. at 1874 (defendant voluntarily showed drug agents a driver's license in the name of Sylvia Mendenhall and a ticket issued in the name of Annette Ford).

### D.  Unpublished Phone Number

In this appeal, even the State concedes that Pearson lacked sufficient articulable objective facts to support a reasonable suspicion of criminal activity by Sery up through the point when Pearson told Sery he was free to leave, i.e., after asking him some questions and being refused consent to search Sery's bag. Pearson also must have concluded, drawing on his nine years of experience in drug courier interception, that the actions he had perceived up to that point did not, even taken together, provide him any legal basis to detain Sery involuntarily. But, the State argues, "*[a]fter the initial encounter* with defendant the officers *obtained additional facts* which caused them to believe defendant was committing a crime.*" Brief for Respondent at 14 (emphasis added).

The only further investigation Pearson did after the first encounter was to obtain and call the callback number Sery had left with the airline reservationist. The only "additional fact" Pearson learned was that "[i]t had been changed to a nonpublished number." This added nothing meaningful or probative to that which he had already observed and evaluated. Pearson stated at the hearing he did not know when Sery had made his reservation or when the number called had been changed to a nonpublished number. Despite this, both Pearson and the respondent twist this into the "fact" that Sery left a "nonworking" number with the airline when he bought his ticket. The fact that a phone number left with an airline (on some unknown date) was changed to an unlisted number (on some unknown date) could not—in light of all the circumstances and the objective facts known to him—lead Pearson to a reasonable suspicion of criminal activity.

### Conclusion

We recognize that a trained law enforcement officer may be able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer. *Mendenhall*, 466 U.S. at 563, 100 S.Ct. at 1882 (quoting *Brown v. Texas*, 443 U.S. 47, 52 n. 2, 99 S.Ct. 2637, 2641 n. 2, 61 L.Ed.2d 357 (1979)); *Trujillo*, 739 P.2d at 88. *See also Brignoni–Ponce*, 422 U.S. at 885, 95 S.Ct. at 2582. If Pearson perceived any such meaning in Sery's actions, he did not articulate that meaning to the trial court.

The objective facts relied upon by Pearson do not support a reasonable suspicion

---

**13.**  The court reporter at the suppression hearing first transcribed the stated name on the airline ticket as "Sid Sellow." Thereafter, it was variously transcribed as Sedsel, Sidsel and Sutcel.

**14.**  Respondent cites *United States v. Espinosa–Guerra*, 805 F.2d 1502 (11th Cir.1986), as support for the notion that an airline passenger's claim to not be carrying identification other than a ticket is a fact reasonably arousing suspicion in a trained drug agent. In *Espinosa–Guerra*, however, defendant's claim that he was carrying no identification assumed unusual significance—along with other objective facts articulated by the investigating drug agent—because he was traveling a long distance and did not speak English. *Id.* at 1508.

that Sery was engaged in criminal activity. We hold that the trial court's determination to the contrary was clearly erroneous. Because the seizure of Sery and his bag for the canine drug sniff violated defendant's fourth amendment rights, the evidence found in the search of his bag should have been suppressed. The order of the trial court denying defendant's suppression motion is reversed, and the case is remanded to the district court for further proceedings consistent with this opinion.

ORME, J., concurs.

DAVIDSON, Judge (dissenting).

I respectfully dissent because I believe the majority erred in affirming the trial court's acceptance of a no contest plea conditioned on defendant's right to appeal the motion to suppress. I also believe the majority incorrectly decided that the motion to suppress should have been granted.

Rather than point out weaknesses in the majority's recitation of the facts, I offer what I consider to be a complete factual statement of the case but one which highlights certain important aspects. At approximately 11:05 a.m. on May 22, 1986, Delta Airlines Flight No. 565, originating in Florida, began deplaning passengers at the Salt Lake International Airport. Observing were several law enforcement officers involved in a training seminar. Approximately 20 members of different police agencies were training at the airport in several groups. Conducting the training was Sergeant William Pearson of the Metro Dade Police Department, Miami, Florida. Sergeant Pearson, a veteran of over 25 years in police work had spent 19 years enforcing narcotics laws. Subsequent to extensive training in narcotics surveillance, investigation, and enforcement, Sergeant Pearson has supervised the drug interdiction unit, primarily concerned with the Miami International Airport, for nine years. During this time, Sergeant Pearson has taught his specialty at colleges and to other police departments throughout the United States including Los Angeles, Denver, and Gainesville, Florida. Among those at the airport with Sergeant Pearson was Agent

Mark Whittaker from the Utah State Narcotics and Liquor Law Enforcement Bureau.

The officers saw defendant leave the aircraft carrying a vinyl suitcase. Sergeant Pearson testified that defendant "stopped momentarily, looked nervously around, waited there for several minutes while other passengers passed him, and then continued on up the concourse." Agent Whittaker testified that defendant "appeared to be very nervous" when he deplaned and that, while the other passengers walked past him, defendant "kept looking around nervously." Referring to defendant, Sergeant Pearson indicated to Agent Whittaker, "Let's take a look at him" or, "Let's follow him."

Defendant proceeded up the concourse until he entered a coffee shop after he "looked nervously around again." Upon exiting the coffee shop, defendant proceeded directly to a bank of telephones separated by partitions. Defendant sat down and picked up a telephone receiver but did not place any money in the machine. Defendant then "put the receiver to his ear, he stood up, looked around, sat back down." Agent Whittaker testified defendant repeated his behavior two or three times without ever inserting any coins into the telephone. Sergeant Pearson testified defendant stood up above the partition on two occasions and looked in his direction. Further testimony by Agent Whittaker indicated Sergeant Pearson and he were about five feet away. Defendant then picked up his suitcase but, rather than taking the normal route from the telephone area, he edged his way between a glass wall and the telephones allowing him to leave the telephone area beyond where the officers were standing.

At this point, Sergeant Pearson, Agent Whittaker, and one other officer approached defendant and identified themselves as police officers. Sergeant Pearson asked to speak to defendant "for a moment" to which defendant agreed. When asked, defendant showed Sergeant Pearson his airline ticket which was in the name of Sidsel. Sergeant Pearson then asked "Mr.

Sidsel" for some identification to which defendant replied that his name was not Sidsel, that the airline had made a mistake, and that he did not have any identification. Defendant did not offer his correct name. When asked if he had "any objections to giving [Sergeant Pearson] a consent to search the suitcase," defendant replied he would rather not. Sergeant Pearson then thanked defendant and informed him he was "free to leave." Agent Whittaker testified that after leaving the officers, defendant proceeded further down the concourse to another telephone area and made calls. Defendant then went to the baggage claim area via the escalator. He waited in that area for several minutes, walked around the downstairs area of the terminal, and went outside on at least one occasion. Meanwhile, Sergeant Pearson determined from Delta Airlines that defendant had arrived from Ft. Lauderdale, Florida and also obtained the "call-back number" given when Sidsel's ticket was reserved. Upon checking the telephone number, Sergeant Pearson discovered, "[I]t was no longer a working number. It had been changed to a nonpublished number." Sergeant Pearson then requested Agent Whittaker to obtain a drug detection dog.

At approximately noon, Officer Brook Plotnik, a dog handler with the West Valley City Police Department, arrived with a drug trained dog. After briefing Officer Plotnik, Sergeant Pearson and Agent Whittaker approached defendant who was seated outside the terminal with his suitcase. From the first conversation with Sergeant Pearson until this second approach by the officers, no law enforcement officer had approached or talked to defendant. Sergeant Pearson asked defendant if he would submit his bag "to a sniff by a drug detection dog." Again, defendant answered that "he would rather not." Defendant was then told by Sergeant Pearson that he and his suitcase were being detained and the suitcase would be presented in a lineup to the drug detection dog. Depending on what happened at the lineup, defendant would be informed of "the next step in the procedure." Sergeant Pearson placed defendant's suitcase in a lineup with four

other bags in the Delta Airlines baggage makeup area, approximately 10 to 15 minutes after Officer Plotnik's arrival. The drug detection dog gave a positive alert to defendant's suitcase. Sergeant Pearson relayed this information to Agent Whittaker who informed defendant of the results of the lineup, placed him under arrest, and informed him of his rights. A search warrant, based on Sergeant Pearson's affidavit, was obtained. A subsequent search of defendant's suitcase revealed three bags of cocaine. Agent Whittaker's report indicates defendant was arrested at 12:25 p.m. Defendant also testified 20 minutes elapsed between the time he was detained and when he was placed under arrest.

Defendant's pre-trial motion to suppress was heard on July 9, 1986. When asked what actions of the defendant aroused his suspicions, Sergeant Pearson replied:

The ones I have testified to earlier. Number one, his apparent nervous looking about when he got off the plane. The fact that he waited there at the deplaning area before he proceeded on to the concourse to wherever he was going to go. His nervous looking about before he went into what I call the coffee shop.

When I went to the pay phone bank, number three, the fact he was, I would guess, making a phone call. But he kept popping up concerned about my whereabouts and Agent Whittaker's whereabouts, as opposed to concentrating his conversation with whomever he was trying to call. This what I find a strange way of exiting the phone enclosure instead of going out with ease into an open area to walk between enclosures and a side hole next to a phone enclosure and a windowed area to the concourse. The fact that after he left, refused to give us a consent to search and was allowed to go on his way, his constant popping in and out of the terminal and walking around. And the fact that he, that the phone number that he gave to the airlines was not a working number, which would mean the airline could never call him and tell him his flight had been cancelled, delayed or whatever.

All these things, accumulatively speaking, I felt very suspicious.

Upon denial of his motion, defendant pled no contest to unlawful possession of a controlled substance. Defendant's plea was couched as:

> [Defense Counsel]: Your Honor, in view of that ruling, we're prepared at this time to enter a conditional plea of no contest to the charges.
>
> I would like to have the opportunity to appeal on the motion, and [prosecutor] and I decided, in view of the Utah Supreme Court's [latest] decision in the *Kay* [*State v. Kay*, 717 P.2d 1294 (Utah 1986)] case where they did allow for conditional pleas, that Mr. Sery can enter a plea on the condition that should the Supreme Court find this motion should have been granted, he can withdraw the plea.
>
> I think this may be a new thing to do, but I think it would probably help judicial administration. There's no sense in going through a trial on facts such as this [sic] and would ask the Court to go along with it. I have explained it to Mr. Sery, he understands it, and he would like to get on with the process rather than wait around for a trial.
>
> [Prosecutor]: That's correct, your Honor.

Defendant's plea was accepted and he was subsequently sentenced to the Utah State Prison for a period not to exceed five years. The prison sentence was stayed and defendant was placed on probation for a period of 18 months. Probation was stayed pending the issuance of a certificate of probable cause which was signed on September 25, 1986.

## CONDITIONAL NO CONTEST PLEA

Utah Code Ann. § 77–13–2 (1982) explains the effect of a no contest plea[1] to an indictment or information. Subsection 77–13–2(3) states:

> A plea of *no contest* indicates the accused does not challenge the charges in the information or indictment and if accepted by the court shall have the same effect as a plea of guilty and imposition of sentence may be rendered in the same manner as if a plea of guilty had been entered.

Utah Code Ann. § 77–13–3 (1982) also states, "A plea of no contest may be entered by the accused only upon approval of the court and only after due consideration of the views of the parties and the interest of the public in the effective administration of justice."

The plea of no contest is treated the same as a plea of guilty; once knowingly and voluntarily entered, there are no issues remaining for trial. *State v. Yeck*, 566 P.2d 1248, 1249 (Utah 1977). In *State v. Beck*, 584 P.2d 870, 872 (Utah 1978), the Court wrote, "By a plea of guilty the defendant waived any claim of error on behalf of the officer in saying that he had been identified as the murderer." A defendant cannot enter a guilty or no contest plea and then base an appeal on objections to the evidence. By entering such a plea, all such objections are waived.

The majority states in footnote 4 that the absence in Utah R.Crim.P. 11, Utah Code Ann. § 77–35–11 (1988), of conditional pleas is not an affirmative bar to such pleas. The majority also cites *State v. Kay*, 717 P.2d 1294 (Utah 1986), as authority for conditional pleas. This is irrelevant. In *Kay*, the trial court accepted a guilty plea to three counts of capital homicide in exchange for the promise that defendant would not be sentenced to death. The trial court agreed to impose one of the statutory punishments for the crimes charged and defendant pled guilty "with no strings attached." There was no plea conditioned on an appeal concerning the state's ability to prove Kay's underlying guilt. What the majority fails to understand is that criminal law is established by statute. As such, it must be strictly construed within the statutory bounds. Counsel and the trial court may not invent a new plea by agreement any more than they can agree to add or delete an element of a crime.

---

1. Utah Code Ann. § 77–13–1 (1988) lists five kinds of pleas: not guilty; guilty; no contest; not guilty by reason of insanity; and guilty and mentally ill.

A further examination of Rule 11 in subsection (e) reveals:

The court may refuse to accept a plea of guilty or no contest and *shall not accept such a plea* until the court has made the findings:

(4) That the defendant understands the nature and elements of the offense to which he is entering the plea; *that upon trial the prosecution would have the burden of proving each of those elements* beyond a reasonable doubt; and that *the plea is an admission of all those elements* (emphasis added)[.]

In light of this rule it is impossible for defendant to enter a no contest plea after his motion to suppress has been denied, yet still base an appeal on that motion. In effect, defendant told the trial court that he was guilty of possession of a controlled substance but that he intended to contest his own admission on appeal. When the trial judge explained the meaning of the no contest plea to defendant, he stated that defendant would still have the right to appeal "because of the stipulated facts in this particular instance here. . . ." This does not comport with the requirements of Rule 11(e). *See State v. Gibbons*, 740 P.2d 1309, 1313 (Utah 1987), for a strict interpretation of the necessity to comply with Rule 11(e).

## INTERLOCUTORY APPEAL

When this case is stripped of its pretensions we find an attempt to circumvent the rules of appellate procedure to force this Court to hear an interlocutory appeal. This is justified and approved by the majority in order to avoid a "pointless and wasteful exercise." As I read R.Utah Ct.App. 5(d), that is precisely the reason for an interlocutory appeal. However, R.Utah Ct. App. 5(a) provides that a petition seeking permission to appeal must be filed with the Court. The Court may then decide to review or not review. The appellate court, not counsel, and not the lower court, is given the opportunity to determine whether the appeal should be taken and whether further proceedings at the trial level would be desirable or a "pointless and wasteful exercise." In this case counsel and the trial court decided to allow a direct appeal to this Court without a prior trial. The request by defense counsel and by the court shows that this is an appeal from the denial of the motion to suppress and nothing more. There is no way under the rules to make such a denial a final order without pleading not guilty and going through a trial. Unless the majority has decided to leave applications of the rules of this Court to counsel and the lower court such appeal is improper.

This case should be remanded and the defendant given the opportunity to enter a proper plea. Until that is done and the correct procedures are followed to bring the case on appeal, this Court has no business reviewing the factual findings. However, the majority has chosen to render an advisory opinion. Since I strongly disagree with the conclusion, I am forced also to write an advisory opinion.

## SEIZURE OF DEFENDANT

I disagree with the majority that defendant's fourth amendment rights were violated and that the evidence found in the search of his suitcase should be suppressed.

Defendant first argues that his detention, and that of his suitcase for investigative purposes, constituted an unlawful seizure because the officers lacked reasonable suspicion that he was involved in criminal activity. Second, defendant asserts that no probable cause existed upon which to base his arrest.

In *State v. Deitman*, 739 P.2d 616, 617 (Utah 1987), the Court cited *United States v. Merritt*, 736 F.2d 223 (5th Cir.1984), *cert. denied*, 476 U.S. 1142, 106 S.Ct. 2250, 90 L.Ed.2d 696 (1986), for the "three levels of police encounters with the public which the United States Supreme Court has held are constitutionally permissible[.]" The Fifth Circuit Court wrote:

(1) an officer may approach a citizen at anytime [sic] and pose questions so long as the citizen is not detained against his will;

(2) an officer may seize a person if the officer has an "articulable suspicion" that the person has committed or is about to commit a crime; however, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop";

(3) an officer may arrest a suspect if the officer has probable cause to believe an offense has been committed or is being committed. See *Florida v. Royer*, 460 U.S. 491, 498–99, 103 S.Ct. 1319, 1324–25, 75 L.Ed.2d 229, 236–37 (1983).

*Merritt*, 736 F.2d at 230.

Concerning the first of the three levels of police encounters, in *State v. Trujillo*, 739 P.2d 85, 87–88 (Utah App.1987), this Court wrote:

[A] seizure within the meaning of the fourth amendment does not occur when a police officer merely approaches an individual on the street and questions him, if the person is willing to listen. However, the person approached is not required to answer the officer's questions, and his refusal to listen to the officer's questions or answer them, without more, does not furnish reasonable grounds for further detention (footnote and citations omitted).

In their brief, the state conceded the police lacked reasonable suspicion when they initially approached defendant. However, what little information provided by defendant was given freely and he was not detained against his will. This clearly was a level one encounter.

From the time of the initial encounter, shortly after 11:05 a.m., defendant wandered the terminal area without restraint until the drug detection dog was in place at several minutes past noon. At that point defendant was detained and his suitcase taken to be included in the lineup presented to the dog. This was a level two encounter requiring the officer to have reasonable suspicion.

The touchstone case applicable to this situation is *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The proposition for which *Terry* is known has

been codified as Utah Code Ann. § 77–7–15 (1982) which states:

A peace officer may stop any person in a public place when he has a reasonable suspicion to believe he has committed or is in the act of committing or is attempting to commit a public offense and may demand his name, address and an explanation of actions.

Again, as noted by the majority, *Terry* admonishes the judiciary to decide each case on its own facts and that a police officer may detain an individual for the purposes of a *Terry* stop where he "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot...." *Id.* at 30, 88 S.Ct. at 1884. *See also United States v. Brignoni–Ponce*, 422 U.S. 873, 885, 95 S.Ct. 2574, 2582, 45 L.Ed. 2d 607 (1975) (In all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling.); *State v. Mendoza*, 748 P.2d 181, 183 (Utah 1987). The trial court "must consider the totality of the circumstances facing the officers" and the "reviewing court should not overturn the trial court's determination unless it is clearly erroneous." *Id.* (citation omitted). The detaining officer's experience in similar cases is an important factor a trial court must weigh in determining if the officer had valid reasonable suspicion. The factors making up such suspicion must be considered in total context rather than in a vacuum. I believe Sergeant Pearson did have reasonable suspicion which he clearly articulated at the suppression hearing. Defendant initially appeared nervous. He appeared nervous to both Sergeant Pearson and Agent Whittaker. The nervousness was exhibited when deplaning, on the concourse, and upon entering the coffee shop. Nervousness alone does not prove reasonable suspicion because such behavior may be consistent with innocent as well as criminal conduct. *Trujillo*, 739 P.2d at 89. But it is a factor to be considered. Defendant also waited in the deplaning area while the other passengers walked past him. Again, a factor to alert a trained officer to the need to investigate further, a duty of

the police. *State v. Houser*, 669 P.2d 437, 439 (Utah 1983). Defendant's behavior at the telephone and his not inserting a coin in the machine is another factor. The initial approach and contact was made after defendant made his unusual exit from the telephone area, another factor.

During the initial stop, the officers discovered defendant's ticket was written in a name denied by defendant to be his and he carried no identification, two more factors to be considered. Subsequent to this valid stop, Sergeant Pearson learned that the flight had originated in Ft. Lauderdale, Florida and that the telephone number given upon reserving the ticket was no longer working and had been changed to a non-published number, additional factors. Agent Whittaker also knew defendant had utilized another telephone further down the concourse to make calls. The totality of this behavior was sufficient to generate a request for the drug detection dog. Between the time of the request and the arrival of the dog, defendant's "constant popping in and out of the terminal and walking around" added further fuel to Sergeant Pearson's suspicions. Defendant was not detained until such time as Sergeant Pearson had abundant, articulable and reasonable suspicion.[2]

## DETENTION OF DEFENDANT

I now address whether defendant's detention was proper. The primary concern is whether the length of the detention transformed it from a *Terry* stop into a de facto arrest. *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 1574, 84 L.Ed.2d 605 (1985). The United States Supreme Court has stated:

[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.

*Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (citations omitted). Guidance is provided in determining what would be "sufficiently limited in scope and duration" by the Court in *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). There, Place's behavior aroused the suspicion of law enforcement officers who were observing activity at an airport. Ultimately, Place's luggage was presented to a drug detection dog which reacted positively to one bag which was found to contain cocaine. The Second Circuit Court reversed Place's conviction and the United States Supreme Court affirmed. Although the Court wrote approvingly of the use of a dog in the examination of luggage suspected of containing drugs, *Id.* at 707, 103 S.Ct. at 2644, it held:

Although the 90–minute detention of [Place's] luggage is sufficient to render the seizure unreasonable, the violation was exacerbated by the failure of the agents to accurately inform [Place] of the place to which they were transporting his luggage, of the length of time he might be dispossessed, and of what arrangements would be made for return of

---

**2.** In footnote 10, the majority acknowledged that Sergeant Pearson "disclaimed any use of a drug courier profile" in his stops of defendant. However, the majority then discusses at great length a law review article primarily concerned with the profile. Several discrete behavioral factors relative to drug couriers are analyzed and, where possible, a percentage is stated. The percentage relates to those drug courier defendants who exhibited the particular factor. The results are not damning when an individual factor is examined. However, when a defend- ant exhibits a multiplicity of these factors, the significance of the percentages fades. The bias in the footnote should also be noted. In most, a small percentage is stated to show just how small the percentage of suspects exhibited the characteristic. In the use of an alias the use of the percentage is reversed. In truth, 78.6% of suspects were using aliases as was Sery. While the majority claims the officers did not know Sery was using an alias, Sery himself told them the ticket was not in his name and that he carried no identification.

the luggage if the investigation dispelled the suspicion.

*Id.* at 710, 103 S.Ct. at 2646.

The United States Supreme Court held a defendant's detention to be unlawful when the defendant was confined in a "large storage closet" with a detective for approximately 15 minutes while another detective retrieved defendant's luggage, brought it to the place of confinement, and opened the two suitcases. *Royer,* 460 U.S. at 507–08, 103 S.Ct. at 1329. Conversely, the Court upheld a 20–minute detention during which the police proceeded expeditiously in confirming their suspicion that defendant was involved in criminal activity. *Sharpe,* 470 U.S. at 687–88, 105 S.Ct. at 1576. The Court stated that its cases "impose no rigid time limitation on *Terry* stops," emphasized the need "to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes," and that there was no "bright line" rule. Common sense and ordinary human experience must take precedence over some rigid criteria. *Id.* at 685, 105 S.Ct. at 1575.

The hearing transcript indicates defendant was told his suitcase was being taken into the airport security area (the Delta Airlines baggage makeup area), into which those without the appropriate security clearance were not allowed, that the suitcase would be included in the lineup, and the next step depended on what happened at the lineup. In any event, it would be further explained to defendant. Sergeant Pearson testified that, if the dog had not alerted on the suitcase, it would have been returned to defendant and he "would have been allowed to leave." During the period the suitcase was taken, defendant was not confined in any manner. Agent Whittaker testified that, when he departed the lineup area after being told of the positive alert, defendant "was seated at one of chairs out in the concourse area." Defendant claims 20 minutes elapsed between the time he was detained and when he was placed under arrest. During this period, Sergeant Pearson rendered his explanation concerning the suitcase to defendant, the bag was taken into the lineup area, the lineup was

arranged, the drug detection dog was introduced to the lineup, and Agent Whittaker walked back out of the lineup area to where defendant was seated. I believe the investigative methods employed by the police during the detention were minimally intrusive and that the duration was limited to that necessary to effectuate the purpose of the detention.

In his initial brief, defendant claims the officers did not have probable cause to arrest him. His argument centers on a lack of reasonable suspicion and that the detention exceeded the scope of a *Terry* stop. I have already discussed these issues but to lay the matter to rest, I need only restate the testimony of Agent Whittaker concerning the dog's reaction when confronted by defendant's suitcase. He stated, "I observed the dog jump on Mr. Sery's bag, attempt to bite it, was scratching it and was very excited." I submit that was probable cause of a very convincing nature.

The majority opinion fails to provide the law enforcement community of Utah with any guidance as to what the officers should have done to have been correct. The obvious message to law enforcement is to leave people alone unless probable cause is present. I strongly disagree. This case should stand as a model of proper police procedure and a demonstration of the step by step development of reasonable suspicion.

The lower court was correct in denying the motion to suppress. It was in error in allowing the entry of an invalid plea. I believe the majority in this case is wrong on both issues.